## UNION CARBIDE CO. v. AMERICAN CARBIDE CO.

(Circuit Court of Appeals, Second Circuit. June 29, 1910.)

### No. 226.

1. PATENTS (§ 42*)—NOVELTY—CHEMICAL COMPOUND—CHANGE OF FORM.

A chemical compound in a new form may be patentable where by reason of its greater purity or efficiency or of its comparative cheapness it is made a commercial, instead of merely a laboratory, product.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 49; Dec. Dig. § 42.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—CRYSTALLINE CALCIUM CARBIDE.

The Willson patent, No. 541,138, for "crystalline calcium carbide, existing as masses of aggregated crystals," discloses patentable novelty, although calcium carbide was previously produced in laboratory experiments in an amorphous condition; the result of the patentee's discovery being a commercially new product of great utility. Nor is such patent anticipated by the Woehler process, published in 1862, the product of which is not shown to be crystalline, nor invalid because of prior public use for more than two years, it not being shown that such use was for other than experimental purposes. While the patent is limited to that form of crystalline carbide which exists as masses of aggregated crystals, it is immaterial whether such crystals are perfect or imperfect; both forms being within its terms. As so construed, *held* infringed.

[Utility, extent of use, and commercial success as evidence of invention, see note to Doig v. Morgan Machine Co., 59 C. C. A. 620.]

3. WORDS AND PHRASES—"CALCIUM CARBIDE."

Calcium carbide is a combination of calcium and carbon in the proportion of one part of calcium (Ca) to two parts of carbon (C), and is expressed in the chemical formula $CaC^2$. The principal use of calcium carbide is to make acetylene gas which is used for illuminating purposes.

Appeal from the Circuit Court of the United States for the Northern District of New York.

Suit in equity by the Union Carbide Company against the American Carbide Company. Decree for defendant (172 Fed. 120) and complainant appeals. Reversed.

Appeal from a decree dismissing the bill in a suit to restrain the alleged infringement of letters patent No. 541,138, granted June 18, 1895, to Thomas L. Willson for an alleged "new and useful product existing in the form of crystalline calcium carbide," and assigned to the complainant. This suit may properly be designated the "product suit" to distinguish it from another suit pending between the same parties called the "process suit."

Edward N. Dickerson and Louis C. Raegener, for appellant.
Charles Neave and Willis Fowler, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

NOYES, Circuit Judge. The patentee states at the commencement of his specification:

"This invention relates to the production of a new form of crystalline calcium carbide.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Before my invention calcium carbide had existed in an amorphous condition, due either to the method of its preparation or the impurities contained in it.

"By my invention herein described calcium carbide is produced in a new form, namely, in crystalline condition, having a bluish or purplish iridescence. The carbide so existing is in a condition particularly applicable, on account of its purity, for conversion into other compounds."

The specification then describes the process followed to obtain the product. The patentee states, in substance, that he takes mechanically powdered coke and lime in the proportion of 35 per cent. of coke and 65 per cent. of lime, thoroughly mingles them by mechanical means, and subjects them to the action of an electric current in a furnace. He further states that the action of the current upon the material is a smelting action, and that the fused calcium carbide when allowed to cool crystallizes, and, when broken, shows iridescent surfaces.

The patent contains but a single claim, which is as follows:

"As a new product, crystalline calcium carbide existing as masses of aggregated crystals, substantially as described."

The defenses are:

(1) That the patent is invalid because there is no patentable novelty in the crystalline form of calcium carbide.

(2) That the patent is invalid because it is anticipated by the Woehler carbide.

(3) That the patent is invalid because the product was in public use more than two years prior to the filing of the application.

(4) That the defendant does not infringe.

Before examining the defenses, it will be well to consider briefly the chemical composition of the product in question, its properties, the uses to which it is put, and the forms which it takes.

Calcium carbide is a combination of calcium and carbon in the proportion of one part of calcium (Ca) to two parts of carbon (C) and is expressed in the chemical formula $CaC_2$. When calcium carbide ($CaC_2$) is placed in water ($H_2O$) the carbon unites with the hydrogen of the water and forms acetylene gas ($C_2H_2$) leaving lime ($CaO$) as the residue. Acetylene gas is employed for illuminating purposes, and has come into general use during the last decade. The principal use of calcium carbide is to make this gas.

In considering the form of the product we note at the outset that bodies in general are divided into two classes: (1) Crystalline and (2) noncrystalline or amorphous. A crystalline body consists of or is made of crystals and a crystal is defined in Webster's Dictionary as follows:

"The regular form bounded by plain surfaces which a substance tends to assume in solidifying, through the inherent power of cohesive attraction."

It appears that calcium carbide under different conditions takes both the crystalline and the amorphous forms. The specification itself states, as we have seen, that the substance had existed in an amorphous form prior to the invention, and the patent relates solely to the crystalline form. Whether it is broad enough to entirely cover that form will later be considered.

Taking up now the different defenses, the defendant in the first place contends that, even if the patent broadly covers crystalline cal-

cium carbide and even if all the calcium carbide of the prior art were amorphous, still crystalline carbide is not patentably novel. It is said that the patent is not for a new product, but for a new form of an old product, having the same composition, properties and uses as the old.

This contention requires us to examine to some extent the history of calcium carbide and to cover some of the ground of the second defense—the alleged anticipation by the Woehler product.

Acetylene gas made from substances other than calcium carbide was discovered in 1836 and different articles about it were later published. In 1862, Woehler, a German chemist, for the first time published in a chemistry year book an article regarding the formation of acetylene from calcium carbide and to some extent indicated the process of making the latter product. This article is printed in full in the footnote,[1] but the especially material part of it is contained in the following lines at the beginning:

"At a very high temperature a calcium carbide can be produced from the alloy of zinc and calcium prepared by Caron, in contact with carbon, whose mode of formation and characteristic will be given later."

As will be observed, the remainder of the article describes the properties of the compound—its decomposition with water and the formation of acetylene gas—and the characteristics of the gas, but says nothing more about the process of making the carbide. There is nothing to indicate that that which Woehler did was anything more than to make and describe a laboratory experiment, and, although his work was generally recognized in treatises upon chemistry, it does not appear that any appreciable amount of calcium carbide was made by any person before the present patentee came into the field.

Concededly the Woehler compound was the highest development of the prior art in calcium carbide, and so we recur to the question whether with that compound in the art—assumed to be amorphous for the purposes of the present discussion—there was patentable novelty in the crystalline form.

In determining the question of patentable novelty, there can be no hard and fast rule. Each case must be decided upon its own facts. Mere change of form in and of itself does not disclose novelty. A new article of commerce is not necessarily a new article patentable as such. But patentable novelty in a case like the present may be founded upon superior efficiency; upon superior durability, including the ability

[1]"At a very high temperature a calcium carbide can be produced from the alloy of zinc and calcium prepared by Caron, in contact with carbon, whose mode of formation and characteristic will be given later. This compound has the remarkable property to decompose with water into calcium hydrate and acetylene gas $C_2 H_2$ the same hydrocarbon which was first discovered by Davy and which more recently has been produced by Berthelot, not only by the decomposition of different organic substances at a red heat, but also directly from carbon and hydrogen under the influence of the electric arc. The gas produced by means of this calcium carbide has not yet, it is true, been analyzed, but it is characterized by the three distinguishing properties of acetylene, namely, to burn with a brilliant smoky flame, to explode with chlorine gas even in diffused light with the phenomenon of fire, and the separation of carbon, and to precipitate from an ammoniacal silver solution the compound which explodes so violently when heated."

to retain a permanent form when exposed to the atmosphere; upon a lesser tendency to breakage and loss; upon purity, and, in connection with other things, upon comparative cheapness. So, as supplementing other considerations, commercial success may properly be compared with mere laboratory experiments.

Now, broadly comparing amorphous and crystalline carbides, we are convinced that the complainant's expert was substantially correct in testifying as follows:

"Usually speaking the amorphous substance is less dense, more soluble, has a lower melting point and less hardness. That would seem to mean that in all probability, even between equally pure compounds, that bulk for bulk, the yield of gas in the case of the amorphous compound would be smaller, that the tendency to breakage would be greater, both because the substance is more porous and less hard, that for such matters as transportation and dangerous dust the amorphous would be the inferior material even if equally pure. In my opinion, however, the amorphous carbide is far less likely to be pure or equally pure with the crystalline, because heterogeneity and quantity of impurity are great helps in formation of the amorphous cômpound. If more impure, it is obvious that the yield, bulk for bulk, is still less than with the pure material, and that the amount of residue after use is greater."

And, if we turn specifically to the Woehler product as it was made before the application for the patent in suit, we reach similar' conclusions. The Woehler publication is meager. All that is said about the preparation of calcium is contained in a single sentence. No information is given concerning the proportions of the ingredients, their preparation, or other similar matters necessary to an understanding of the process. Still it seems that, whenever before the time of the present patent the compound was prepared in accordance with what information the article did furnish, the result was a black pulverulent mass. This powdery material was worthless commercially, and was never commercially used. It would be unfit for use in gas generators, and we are satisfied would rapidly deteriorate when exposed to the air. The product of the patent is more durable. It is hard, compact, and so unlike the powdery mass as almost to amount to a new body. Moreover, we think the complainant correct on its contention that the iridescent surfaces of the crystalline carbide would protect it to some—although, perhaps slight—extent from atmospheric action.

It is also quite clear that Woehler published a mere result of a laboratory experiment which was put to no practical use. Crystalline carbide, on the other hand, has been a great commercial success, and has furnished the foundation for important industries.

Taking the Woehler compound as it was made before Willson applied for his patent, we are satisfied that the product of the patent marked a patentable advance over it. And if we also make comparisons in the light of the recent experiments made in behalf of the defendant—which we will consider later and will not now discuss—it is sufficient to say that our conclusion is not changed. We think that there is a patentable difference between the later product and the product of the patent, although such difference exists in less degree than in the case of the earlier Woehler product.

For these reasons, it is held that the product possesses the requisite patentable novelty. And we must regard this conclusion as not only

well founded in law, but as most just. To hold an important discovery which has given to the world a commercially new product—a product the high utility of which must be conceded—not entitled to protection for want of novelty, would, as it seems to us, be applying the patent statute to defeat its fundamental purposes.

The defendant's second defense, as we have noted, is that the patent, if broadly for crystalline calcium carbide, is invalid, because it is anticipated by the Woehler carbide.

Our examination of the first defense covers most of the ground necessary to be examined in considering this defense. But there are essential distinctions. It was assumed in considering the first defense that the Woehler product was amorphous. But such assumption was for the purpose of testing that defense only. If the Woehler compound were amorphous, it manifestly did not anticipate the crystalline product in view of the differences between the forms already pointed out. To anticipate, the Woehler compound must be shown to be crystalline, and the defendant in the present defense strenuously insists that it is crystalline. It is not shown that any of the Woehler compound which was made before the application for the patent was crystalline, and, indeed, we think the testimony tends to show that it was amorphous. But it is contended that experiments made by the defendant's witnesses for the purposes of this suit demonstrate the crystallinity of the Woehler carbide. Now, as already pointed out, the Woehler article furnished very little information concerning the process of making calcium carbide. Practically, all it said was that at a high temperature calcium carbide could be produced from an alloy of zinc and calcium in contact with carbon. Woehler was making note of a laboratory experiment evidently employing minute amounts of material, and seems to have been more interested in the formation of acetylene from the carbide than in the formation of the carbide.

The defendant's experts in following the Woehler process used considerable amounts of material in a furnace, applied a high degree of heat for a long time, and obtained a hard, compact mass of material having no resemblance to the Woehler product as already described, viz., a black powdery substance. Without discussing the details of the experiments, it is enough to say that we are not at all satisfied that the defendant's experts in producing their compound did no more than follow the teachings of the Woehler article. Assuming, however, that this compound was produced by the Woehler process, the next question is whether the defendant has established its crystallinity. Upon this question, the testimony of the expert witnesses called by the defendant and complainant is wholly irreconcilable. The experts for the defendant testify that this compound does exist in a crystalline condition. On the other hand, the experts for the complainant testify that the calcium carbide is not crystalline, although they say that the compound does contain another substance—calcium cyanamide—in crystalline form. It would serve no useful purpose to review this conflicting testimony nor to discuss the reasons pro and con given by the experts. It is sufficient to say that upon careful consideration of the testimony we are not satisfied that the carbide of the experiments was crystalline. The burden is upon the defendant to

establish crystallinity, not upon the complainant to disprove it, and, among other things, we cannot ignore the possibility that the defendant's witnesses may have attributed the crystallinity of the calcium cyanamide in the product to the calcium carbide. Consequently the Woehler product, whether correctly represented by the earlier compound or by the result of the recent experiments, must be held not to anticipate.

The defendant's third defense is that the patent in suit is invalid because the claimed product was in public use for more than two years prior to the filing of the application. The application for the patent is dated March 4, 1895, so that we must see whether a public use of the product prior to March 4, 1893, is established.

We find experimental uses of the product before that time. We find that Lord Kelvin in a foreign country put some of the carbide in water, and lighted the gas which was generated. We find that the patentee gave samples of the product to different persons for experimental purposes. But it is well settled that an inventor has the right to experiment in perfecting his invention and demonstrating its utility, and we are not satisfied that the patentee in this case did anything more. We think that the proof fails to establish that there was any public use of the invention more than two years prior to the application for the patent.

The fourth defense is that the defendant does not infringe, and the examination of this defense requires the consideration of the construction to be placed upon the claim of the patent. Ordinarily, in interpreting a claim, we should, at the outset, seek to ascertain its meaning from the language used. But in view of the contentions of the parties and of the decision of the Circuit Court, we think it preferable in this case to first trace the passage of the claims of the patent through the Patent Office.

The file wrapper of the patent shows that Willson's original claim was as follows:

"As a new product, crystalline calcium carbide having a bluish iridescence, substantially as described."

This claim was rejected, and the applicant then filed an amendment stating two claims, as follows:

"1. As a new product, crystalline calcium carbide existing as masses of aggregated crystals having a bluish iridescence, substantially as described.
"2. As a new product, crystalline calcium carbide, existing as masses of aggregate crystals, substantially as described."

The Patent Office then said that the two claims were not patentably different and the applicant erased the first claim, leaving the second—the present form—as the single claim of the patent, which was thereupon issued.

It is strenuously urged by the defendant, and was held by the judge at circuit, that the defendant by amending his claim in consequence of the action of the Patent Office deprived it of any broad application. It is said that the applicant in his original application having broadly claimed crystalline calcium carbide and having acquiesced in the rejection of the claim cannot now contend that "crystalline calcium car-

bide existing as masses of aggregated crystals" means nothing more than crystalline carbide. As we think, this contention is correct. The claim is undoubtedly limited to the form of crystalline carbide which exists as masses of aggregated crystals. There must be an aggregation. The claim does not cover an individual crystal nor any number of separate crystals not aggregated or joined together. To illustrate: Had there been a question whether the Woehler powdery substance was amorphous or composed of minute separate and distinct crystals, the claim as amended would have excluded it in either case, while the original claim would have been anticipated by it had it been composed of crystals. That this distinction might reasonably have been in the mind of the framer of the claim is shown by the statement in the defendant's brief that "crystalline powder" is well known.

But it is urged that the limitation of the word "crystalline" is not by the word "aggregated," but by the word "crystals." It is said that the phrase "masses of aggregated crystals" has a specific and limited meaning—i. e., it means "crystal aggregate," which is a union of two or more fully developed crystals as distinguished from "crystalline aggregate," which is a mass of crystal grains devoid of their characteristic forms and closely packed together. But we are by no means satisfied that any such fine distinction as this—based upon academic definitions in the Williams book—is so generally recognized by authorities upon crystallography or chemistry that we would be warranted in applying it in construing the claim in suit, especially when reading the claim in connection with the specification. To draw such a distinction is to say that there are two forms of crystalline calcium carbide: (1) Aggregations of perfect or well-faced crystals, and (2) aggregations of broken, confused crystals. But it is certain that masses of perfectly developed crystals could not be produced by the process described in the patent, and it is not certain that they could be produced by any known process. To confine the claim of the patent to masses of perfectly developed crystals would be, we think, by a strained construction to read out of the claim the only product producible by the process of the patent and to deny protection to a meritorious invention.

In our opinion the patent covers crystalline carbide when the crystals are aggregated in masses, whether such crystals be perfect or imperfect, and, as it is admitted that there are crystals in the defendant's carbide and as those crystals are so aggregated, we think that the product of the defendant infringes.

The decree of the Circuit Court is reversed, with costs, and the cause remanded, with instructions to enter a decree for the complainant for an injunction, an accounting, and costs.