**BINNEY & SMITH CO. v. UNITED CARBON CO. et al.**

**No. 4837.**

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1942.

Dean S. Edmonds, of New York City (Roger T. McLean, of New York City, Howard R. Klostermeyer and Price, Smith & Spilman, all of Charleston, W. Va., and Pennie, Davis, Marvin & Edmonds, of New York City, on the brief), for appellant.

George P. Dike, of Boston, Mass. (Arthur M. Smith, of Detroit, Mich., and Osman E. Swartz, of Charleston, W. Va., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a suit for infringement of Wiegand and Venuto Patent No. 1,889,429, covering carbon black pellets and a process for making them. It was instituted by Binney & Smith Company, assignee of the patent, against the United Carbon Company and the United Carbon Company, Inc. Only the product claims of the patent, claims 1 and 2, are in suit. The court below held these claims invalid as lacking novelty and invention and also because of indefiniteness in the description of the product. The court held further that, if broadly construed, the claims would be infringed by the product of defendants, but that, even if valid, they should be strictly construed and that, when so construed, they were not infringed. From an order dismissing the suit, the plaintiff has appealed.

We think that the evidence shows conclusively that the patentees under the patent in suit were the first to solve the problem presented by the dust nuisance arising from the use of carbon black in the manufacture of rubber tires for motor vehicles. Carbon black is produced by burning low quality gas and capturing the unconsumed carbon carried in the flames. As it comes from the burning house, this is a loose, light, fluffy product, weighing about three pounds to the cubic foot. Through agitation and compression, the air is driven out of it to as great extent as possible; but even after this is done, the product is a finely divided powder, weighing only about twelve pounds to the cubic foot and composed of particles a millionth of an inch in diameter, so small that they can be seen only with the aid of an electron microscope. By 1915 it was recognized that the use of carbon black as a filler in the manufacture of rubber for automobile tires greatly improved the quality of the tires; but the dust arising from the use of the extremely fine powder in the process of manufacture was all but an intolerable nuisance. Efforts to produce carbon black in a form which would eliminate the dust nuisance engaged the attention of a number of the best minds connected with the rubber industry, but until the issuance of the patent in suit these efforts were unavailing. A large number of patents were applied for and issued, but none covered a product which would meet the demands of the industry. Some attempted granulation of the powder by the use of binders such as oil or tar, but these failed because the industry objected to the binders which they contained. Others attempted wetting the carbon black with water or other volatile liquid and then drying it out, but these failed because the result was a dried "mud cake" the breaking up of which revived the dust nuisance, and the particles of which were "harsh" and did not disperse satisfactorily in the rubber. None succeeded in putting the carbon black in a form which the industry was willing to accept.

The invention of plaintiff's patent consisted in producing carbon black in the form of small rounded pellets, which were dustless and which would disintegrate into the original small particles of carbon black when subjected to the pressure involved in the rubber manufacturing process. These pellets could be easily handled and could be transported in tank cars or stored in bulk instead of being shipped in paper bags, as required in the case of the carbon black powder. They were made by wetting carbon black with water, introducing into the mass a liquid such as gasoline, and then subjecting the mass to violent churning or agitation, with the result that the carbon particles would agglomerate in the form of

small rounded pellets, after which the gasoline would be evaporated, leaving the pellets in the pure carbon state. The process is thus described in the specification of the patent:

"The carbon black is first mixed with water so as to form a comparatively thin paste with most of the occluded gases driven out. After thorough mixing gasoline is added and the whole mass thoroughly agitated. As a result substantially all of the carbon black floats on top of the water in the form of pellets and may be readily removed by filtering, decanting or the like. These pellets may then be dried to remove the absorbed gasoline and such moisture as there may be contained therein. * * *

"On the first addition of gasoline to the black and water paste, with agitation, the mass seems to thicken like an emulsion; then on further shaking, it seems to flocculate into granules; as the agitation goes on, a slight creaming to the top of the pellets or a scum takes place, then gradually the pellets form and float to the top. The end point is reached when the water below is free of carbon-clear.

"The pellets are then screened off by any of the various methods, placed in an oven or a recovery apparatus and freed from solvent and water. * * *

"Merely as an example of the relative proportions which we have found to operate satisfactorily, we give the following by weight:

| | Parts |
|---|---|
| Carbon | 5 |
| Water | 40 to 80 |
| Gasoline | 7 to 9 |

"In carrying out our improved process with these proportions, the mass may be thoroughly shaken or otherwise agitated for about five minutes and the resulting pellets will be of about one-sixteenth of an inch in diameter and will be fairly uniform in size.

"The pellets are very porous, of substantially spherical or globular form, have a smooth somewhat lustrous outer surface which is not easily broken by handling, are more compact than untreated carbon, are fragile under light pressure, and may be easily reduced to soft minute particles which cannot be told from the original particles except that possibly they have a more unctuous feel. They somewhat resemble lead shot and may be rolled in the hand without dirtying or dusting. Apparently the outer surface portion or shell of each pellet is slightly more compact than the inner part, but still porous."

Claims one and two of the patent, being the product claims here relied on, are as follows:

"1. Substantially pure carbon black in the form of commercially uniform, comparatively small, rounded, smooth aggregates having a spongy porous interior.

"2. As an article of manufacture a pellet of approximately one-sixteenth of an inch in diameter and formed of a porous mass of substantially pure carbon black."

The evidence leaves no doubt but that the dust problem in the rubber industry was solved by the pellet produced by the patent. Rubber manufacturers were wary of accepting it at first; and its acceptance was further retarded by reason of a higher price being demanded for it than was charged for the carbon black powder, but the evidence leaves no doubt but that it was regarded from the beginning as a valuable improvement and was destined to have wide commercial success. Application for the patent was not filed until 1927. In 1928 sample lots were sent out to prospective customers. In 1929 there were commercial sales of 20,000 pounds, in 1930 of 164,000 pounds, in 1931 of 194,000 pounds and in 1932 of 281,000 pounds. In 1932 there was discovered an improvement in the process of manufacture which, by eliminating the use of expensive gasoline, cheapened the process and resulted, we think, in an improvement in the product. From then on the sales of plaintiff steadily mounted, being 800,000 pounds in 1933, 3,300,000 pounds in 1934, 30,000,000 pounds in 1936 and 97,000,000 pounds in 1939. Other companies in the meantime had entered into the production of the pelleted product, so that by 1939 this form of carbon black had virtually superseded the powdered form for use in the rubber industry.

With reference to improvements in the process and product, these have resulted from the use of only one liquid and, finally, no liquid at all in the formation of the pellets. It will be observed that the process of plaintiff's patent prescribes churning or agitation of the mass of carbon black and liquids. This churning or agitation is evidently the really important thing in the

process, and, when properly carried on, is what causes the carbon black to agglomerate into pellets, and to do so whether any liquid is present or not. These one liquid and no liquid processes, being different from the processes of plaintiff's patent, were of course patentable, and the use of such processes, omitting as they did elements essential to plaintiff's process, did not infringe that process; but this does not mean that the product produced by them, even if an improvement on the product of the patent in suit, does not infringe the product claims of that patent.

■ The first question which arises with respect to the product claims in suit is whether such a product was patentable, not being a "combination of matter", but being composed of pure carbon black. We think that it was. It was patentable as a "manufacture". As said by Judge Acheson in Johnson v. Johnston, C.C., 60 F. 618, 620: "The term 'manufacture,' as used in the patent law, has a very comprehensive sense, embracing whatever is made by the art or industry of man, not being a machine, a composition of matter, or a design. Curt.Pat. § 27; 1 Rob.Pat. § 183." In J. E. Baker Co. v. Kennedy Co. et al., 3 Cir., 253 F. 739, a patent was sustained covering magdolite, a product which was no more than dolomite rock with certain objectionable features removed. And in Union Carbide Co. v. American Carbide Co., 2 Cir., 181 F. 104, it was held that calcium carbide in the form of crystals was patentable as a new product, although the chemical combination in other forms was well known. And there can be no question as to the patentability of the product as distinguished from the process for making it, which was also patentable. Providence Rubber Co. v. Goodyear, 9 Wall. 788, 796, 19 L.Ed. 566, Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 319, 29 S.Ct. 495, 53 L.Ed. 805; Hide-Ite Leather Co. v. Fiber Products Co., 1 Cir., 226 F. 34, 36. As said in the case last cited:

"It is a well-recognized rule that a new product, having definite characteristics by which it may be identified, and which distinguish it apart from the process by which it was produced, may be properly described by such characteristics, and when so claimed and described the claims are not limited to the process. Maurer v. Dickerson [3 Cir.], 113 F. 870, 51 C.C.A. 494."

We entertain no doubt as to the patentability of the product here involved. What we have is not an obvious change of form which anyone could make, once the desirability of such change was recognized, as was the breaking up of the flakes of glue in Milligan & Higgins Glue Co. v. Upton, 87 U.S. 3, 24 L.Ed. 985, but the manufacture of an entirely new form of a product, having new characteristics and advantages, and solving problems in connection with the use of the product which had long baffled those most highly skilled in the art. Although a form of carbon black in which the dust nuisance would be eliminated had been sought diligently, it had not been found up to that time. The product of the patent solved not only this problem but also problems connected with handling and transportation. It did this by agglomerating the tiny particles of the powdered product into small granules or pellets which were dustless, which were flowable and which would disintegrate in the process of rubber manufacture so as to preserve the advantages of the dispersability of the tiny particles. Carbon black in such form was a new and highly useful product; and we see no reason why those who first made it should not be protected with respect to the new product which they had brought forth as well as with respect to the process which they had devised for making it.

■■ We have carefully considered the patents relied on as anticipations, and we do not think that they anticipate. Thirty-eight prior patents were introduced in evidence in the court below, which, in itself, tends to weaken the contention as to lack of novelty. As we said in Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 917: "Such a citation of so many prior patents almost inevitably means either that none of them is nearly like the invention of the patentee and that the attempt is being made to invalidate the patent because the patentee has brought together for the purposes of his invention devices to be found in prior patents of different character, or that prior attempts to solve the problem with which he was confronted have not met with success." Seven of these prior patents were cited by the court below but only five of them are relied upon by defendants in their brief in this court, viz.: Geer No. 1,245,-700 (1917), Lewis No. 1,263,082 (1918), Knowlton and Hoffman No. 1,286,024 (1918), Trent British Patent No. 183,430

(1923), and Coffin and Keen No. 1,561,971 (1925).

None of these patents discloses any such product as is covered by the patent sued on. The Geer patent involves the use of water or gasoline to agglomerate the carbon black particles and the use of the resulting product before it has dried out, with the water or gasoline acting as a binder for the particles as they go into the rubber batch. The patent was a failure because the use of a binder of any sort was objectionable to the industry. The Lewis patent involves the caking of carbon black by mixing it with a liquid and then drying the mixture; but this does not produce the granules or pellets of the patent but a cake which has to be broken up, with a revival of the dust nuisance. The Knowlton and Hoffman patent speaks of the granulation of the carbon black by mixing it with a volatile liquid and then drying it; but it does not disclose how this is to be done and the only illustration of the process which is given requires the use of starch as a binder. Nothing was contributed to the art by any of these patents. They were granted to technologists of recognized eminence in the industry; and it is a safe assumption that, if they had contributed anything to the solution of the problem which confronted the industry, their value would have been recognized and they would have been used. As it is, they show merely that the industry knew what was needed, but not how to achieve it.

The Trent British patent relates to a process for agglomerating coal dust with a binder of fuel oil to produce a fuel. The patent is broad enough to cover the use of carbon black, as the term "carbonaceous material" is used to describe the dust agglomerated; but the binder condemns the product for use in the rubber industry and differentiates it from the product of the patent in suit. The Coffin and Keen patent relates to a process for drying clay or "other pulverulent material". While one of the claims is for "a fluent dried pulverulent inorganic material in the form of very small dried friable globular masses", it nowhere discloses how to make these successfully of carbon black; and the fact that it seems to have occurred to no one to use the process disclosed to produce something which the industry needed so badly is a practical answer to the contention that it anticipates the patent in suit. The high temperature prescribed by the patent for use in the drying process would preclude its use in connection with carbon black.

■ We see no merit in the contention that the product claims are vague or indefinite. They describe the product, not in terms of function as defendants contend, but in terms of size, content, shape and texture. The pellets are described as small aggregates composed of substantially pure carbon black, as being rounded and smooth in shape, and as having a spongy, porous interior. We think that this describes them as accurately as they can be described. There is no requirement, in law or in common sense, that in the description the exact size of the pellets be given, if this were possible, or that the exact nature of the porosity or friability be set forth. The patentees had made a substantial contribution to an important art by solving a problem which had baffled other technological experts who had addressed themselves to it. They described their product in terms by which any one could identify it; and they set forth a process by which it could be manufactured. Theirs was a pioneer patent as applied to the particular art; and its claims are entitled to a liberal construction. Walker on Patents, 6th Ed., § 232. Greater precision or particularity in the description of the pellets might have had the effect of limiting the scope of the patent to a narrow section of the field which patentees were entitled to occupy.

■ Nor are we impressed with the contention that the claims covering this new and useful product are to be given a narrow or limited construction because other broad claims were disallowed by the patent office and later abandoned. The rule is well settled, of course, that claims allowed may not be construed so as to cover broader claims which have been rejected and abandoned. Doughnut Machine Corp. v. Joe Lowe Corp. et al., 4 Cir., 67 F.2d 135, 138. This does not mean, however, that the language of a claim is to be denied its ordinary meaning because another claim containing somewhat similar language has been rejected. The abandoned claims were rejected because "so broad that the product might be quite different" from that of patentees and as not properly defining appellant's invention. Whether they were thought broad enough to include a pellet made with a binder or not, certain it is that the claims

allowed adequately describe the product, which should not be denied protection because other and broader claims, thought not to describe it adequately, have been rejected. It is worthy of note that none of the citations upon which the rejections were based disclosed anything like the product of the patent.

On the question of infringement, we think there can be no reasonable doubt. The court below held that plaintiff's product and defendant's product "are generally similar" and that the claims in suit would be infringed if construed broadly. Since the patent was for a pioneer invention in this particular art, we think, as stated above, that the claims are entitled to a broad and liberal construction. Irrespective of this, however, we think that there is infringement by defendant's product for the reason that it is substantially the same thing as the product of the patent. There are the same small pellets of carbon black, which are substantially pure for the practical purposes of the art. They are smooth, round and flowable, just as are the pellets of the patent. They are substantially the same size, and are porous and friable.

If, as is argued, the improved processes followed by defendants result in firmer pellets more easily handled, this does not avoid infringement, if the product is substantially the same as that covered by the patent; for nothing is better settled than that improvement does not avoid infringement. Walker on Patents, 6th Ed., § 452 and cases cited. The improver is entitled to protection by patent, just as is the original inventor; but this does not entitle him to use the original invention. The monopolies of the two patents are mutually exclusive. The improver may not make the product even by his improved process without license from the original inventor; and the original inventor may not make the improved product, or use the improved process, without license from the improver. If this were not so, the value of patents for the most useful inventions would be swept away by any improvements made on them, in the one case, and the granting of a patent would freeze the state of the art, in the other. As it is, each is allowed a monopoly for the statutory period on what he has invented and no more.

For the reasons stated, we are of opinion that the product claims sued on are valid and infringed by the product of defendants.

The decree appealed from will accordingly be reversed and the case will be remanded for further proceedings not inconsistent herewith.

Reversed.