Jim Brown HOLLIDAY and Harrington Manufacturing Company, Incorporated, Plaintiffs,

v.

LONG MANUFACTURING COMPANY, Inc., Long Supply Company, Inc., Long Tobacco Harvesting Company, Inc., William R. Long, John G. Long, James O. Hall, Defendants.

LONG MANUFACTURING COMPANY, Inc., Plaintiff,

v.

HARRINGTON MANUFACTURING COMPANY, Inc., J. J. Harrington, C. B. Stanfield, V. E. Fountain, Ethel J. Harrington, Ethel B. Harrington, Jim Brown Holliday, Defendants.

Civ. Nos. 340, 350.

United States District Court
E. D. North Carolina,
Washington Division.
Nov. 30, 1956.

See also D.C., 18 F.R.D. 45.

Henry C. Bourne, Tarboro, N. C., A. Yates Dowell, Washington, D. C., for plaintiffs in No. 350, defendants in No. 340.

Pritchett & Cooke, Windsor, N. C., Robert F. Davis, Washington, D. C., for plaintiffs in No. 340, defendants in No. 350.

GILLIAM, District Judge.

These two actions were consolidated for hearing. Both plaintiffs allege patent infringement and unfair competition in the defendants' production and sale of a tobacco harvesting machine. The same facts are at issue in both cases.

The parties consented at the trial to dismiss the defendants Long Supply Company, Inc., John G. Long, and James O. Hall from the action brought by Hol-

liday and Harrington Manufacturing Company, Inc., against Long Manufacturing Company, Inc., et al. Similarly, C. B. Stanfield, V. E. Fountain, Ethel J. Harrington, and Ethel B. Harrington were dismissed as defendants from the action by Long Manufacturing Company, Inc., against Harrington Manufacturing Company, Inc., et al.

Before considering the controversy presented in these consolidated cases, it will be helpful to look generally at the tobacco harvesting problem as it existed prior to 1952, when the first concrete steps toward its solution were taken by the litigant, Jim Brown Holliday.

The bright leaf, flue cured tobacco cultivated in North Carolina, Virginia, and other Southern states is grown from seed in sheltered plant beds. In spring the young plants are reset in regularly spaced rows through the fields. Fully grown plants are about five to seven feet in height. Broad tobacco leaves, from six inches to two feet long, grow directly out of the stalk, beginning a few inches above ground level and continuing at intervals to the top of the stalk.

The leaves do not mature uniformly. The whole plant cannot be harvested at one time. Bottom leaves are the earliest to ripen. Others follow progressively until the tip leaves are reached. Thus a single field may be harvested or primed from three to six times within a single season.

Ripe leaves must be selected by hand. The customary process was for pickers or primers to walk between the rows of tobacco, take the leaves ready for curing and place them in a small wagon or sled. The conveyance filled in this manner is pulled out of the field to a place where "handers" make convenient bundles of the leaves and pass the bundles by hand to "loopers", who attach them with cotton twine about the stems to a stick. The sticks, with many bundles of tobacco leaves tied to each, are placed on racks to await removal to similar racks in a curing barn.

This traditional system of "barning" tobacco involves direct handling of the leaves by three different groups of workers, to wit, "primers", "handers", and "loopers". Expenses to the producer resulting from high labor costs and a damaged product were excessive. The labor was arduous and slow.

In 1952, Jim Brown Holliday was farming near Jamesville, North Carolina. With the aid of a machine shop in Williamston, North Carolina, he built a high clearance, tobacco harvesting machine. Like many "firsts", Holliday's first model was a rather crude apparatus. There was a poor tobacco crop that summer. The machine was mainly used for spraying insecticides. However, Holliday's limited trials of his machine as a harvester convinced him that the basic idea was sound.

High clearance machines, in the farm implement art, are devices which roll through a field and pass over the tops of growing plants, leaving them unharmed. Such machines have long been used for such purposes as detasseling corn, spraying, and dusting crops. Never had one been made for independent use in tobacco leaf harvesting. Holliday's idea consisted of mounting on the overhead platform, racks for the tobacco sticks in a convenient location for the looper to tie the leaves as they passed up to him in clips on a conveyor chain from the primer riding beneath the platform in an adjustable seat adjacent to the tobacco and to the lower reach of the conveyor chain The conveyor chain was hand operated.

Through the fall and winter he worked to improve his harvester. When the 1953 summer harvest season arrived, he was ready with a machine that had power driven conveyor chains. This improved version of Holliday's machine operated in the field on July 3, 1953, and was given some publicity in the nearby Williamston newspaper.

On October 9, 1953, Holliday applied for his patent. March 16, 1954, Patent No. 2,672,248 was issued to him. Meanwhile on March 5, 1954, he entered into a contract with Harrington Manufacturing Company, Inc., whereby Harrington was granted an exclusive license to man-

ufacture harvesters under Holliday's patent. Holliday himself managed sales for Harrington. Roanoke Holliday Tobacco Harvesters appeared on the market for the 1954 harvest season.

W. R. Long, of Tarboro, North Carolina, entered the farm implement business in 1943. For some time prior to 1953 he had entertained the idea of making a tobacco harvesting machine. His first steps toward that end were taken in June of that year when he and his draftsman, W. E. Davis, launched a building program on two different harvesters.

The Davis machine featured an automatic looper or sewing head for which he later obtained a patent (No. 2,715,-968). His machine was tested July 9, 1953. Long was not satisfied with its performance and did nothing further with it.

The second machine built in Long's plant was first tried out July 13 and 14, 1953. Long and his employees ran further tests with it through July and August. Several thousand people came to a widely publicized demonstration on Labor Day, September 7, 1953. Three more such machines made by Long were displayed at the North Carolina State Fair in mid-October of that year.

Long was encouraged by the reception accorded his machines. He set up production and sales organization and equipment at substantial expense. The venture enjoyed considerable commercial success in the 1954 season and again in 1955.

The W. R. Long patent application was not made until July 28, 1954. While it was pending, an examiner attempted to force Long to set up an interference with claim No. 7 of Holliday's patent, which I shall set out in full later. Upon review in the Patent Office, it was held that the examiner was not authorized to force Long into an interference. The basis of that decision was that forced interferences are available when the subject matter of a prior patent is being claimed in different language, but

not when the applicant simply refuses to make any claim which conflicts with the claims of a prior patent. The decision only dealt with Patent Office procedure. It is not subject to the interpretation that a device made by Long would not infringe Holliday's patent. It merely upheld Long's privilege to decline allowing that question to be determined in the Patent Office. In this connection it may be added that lack of interference at the Patent Office is not conclusive of noninfringement. University of Illinois Foundation v. Block Drug Co., D.C., 133 F.Supp. 580, and cases cited therein. Long got his patent March 15, 1955.

The first controversy presented by this case ranges around claim No. 7 of the Holliday patent, which reads as follows: "A tobacco harvester comprising a frame, wheels supporting said frame, vertical members secured to said frame in spaced relationship to each other, vertically extending conveyor chains carried by said vertical members, drive means for actuating said chains, a platform secured on top of said frame, said chains extending upwardly above said platform from there below, said chains having spring pressed clips attached thereto for resiliently engaging and carrying tobacco leaves, a plurality of seats, and means adjustably suspending said seats from said vertical members in back of said chains."

During the trial, the Court made a first hand comparison of the machine manufactured by Harrington and the one manufactured by Long. They are very nearly alike. Holliday and Harrington contend that if Holliday's claim No. 7 is accorded due scope, Long's harvester constitutes an infringement, despite the inclusion on the accused harvester of certain unpatentable improvements. Long contends that Harrington has never manufactured a machine within the scope of Holliday's patent. He says that Harrington, with the aid of Davis and others hired from Long's company, copied the Long machine, which was proving to be a commercial success, and infringed his patent. It is also de-

nied that his machine infringes the Holliday patent.

 The device described in Holliday's claim No. 7 is clearly worthy to be designated an invention. It is not "wanting in any unusual or surprising consequences from the unification of the elements here concerned * * *." Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, at page 152, 71 S.Ct. 127, at page 130, 95 L.Ed. 162. Is it, however, a pioneer invention entitled to a broad range of equivalents? I believe that it is.

In Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, at page 561, 18 S.Ct. 707, at page 718, 42 L.Ed. 1136, the Supreme Court discussed the term "pioneer" as it is used in patent law. "This word, although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. Most conspicuous examples of such patents are the one to Howe, of the sewing machine; to Morse, of the electrical telegraph; and to Bell, of the telephone."

From Dean Rubber Mfg. Co. v. Killian, 8 Cir., 106 F.2d 316 at page 319, I quote the following language, substituting the name of Holliday for that of Killian. "Holliday was the first to produce a machine which successfully performed the function which had been formerly done by hand, and the mechanical performance of which had been long sought by the industry, and * * * the machine of the patent is, therefore, a pioneer invention."

 The key word in Holliday's claim No. 7, is "vertical". The claim calls for "vertical members", "vertically extending conveyor chains", "means adjustably suspending said seats from said vertical members". The illustrations that accompany Holliday's patent show these parts to be truly vertical. However,

the scope of patent claims are not to be strictly limited to the form illustrated in drawings. Oates v. Camp, 4 Cir., 83 F.2d 111; Pangborn Corp. v. W. W. Sly Mfg. Co., 4 Cir., 284 F. 217. In neither the Long machine nor the one manufactured by Harrington are all the frame members or all stretches of the conveyor chains truly vertical. They are substantially vertical.

Long contends that Holliday's claim is limited to a harvester with chains and side members, absolutely vertical. Holliday contends that "vertical member" in claim No. 7 refers to an entire side of the frame, the whole of which is in a truly vertical plane, and that the term does not refer merely to an individual element of the frame, which, though in the vertical plane of the whole, is not individually vertical. To clarify this contention, consider the letter N. Holliday says the entire character constitutes the "vertical member", not the slanting cross-bar solely. Holliday further argues that, if "vertical member" is not construed in his favor, the word "vertical" should be interpreted, or broadened, by the doctrine of equivalents, to include "substantially vertical".

 The harvester illustrated in Holliday's patent is the model that he had in operation during the summer of 1953. It was truly a "homemade" machine. Modification and streamlining were necessary before the device could be produced commercially. As was pointed out in the much cited case, Hildreth v. Mastoras, 257 U.S. 27, at page 34, 42 S.Ct. 20, at page 23, 66 L.Ed. 112: "It is not necessary, in order to sustain a generic patent, to show that the device is a commercial success. The machine patented may be imperfect in its operation; but if it embodies the generic principle and works, that is, if it actually and mechanically performs, though only in a crude way, the important function by which it makes the substantial change claimed for it in the art, it is enough." I hold that the scope of Holliday's generic, or pioneer, patent is not limited to coverage of replicas of

**532**

his original embodiment of the invention.

■■■ Claims are interpreted in the light of their file-wrapper history. A narrow claim that is allowed may not be broadened to encompass the subject matter of a wider claim that has been denied by the examiner. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S. Ct. 513, 86 L.Ed. 736; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132; Smith v. Florence-Mayo Nuway Co., 4 Cir., 182 F.2d 507. Holliday's history in the Patent Office indicates that he was under no compulsion to word his claim as it was done. "Vertical" was a random adjective chosen to describe the then existing form of the tobacco harvester. This is not a design patent. Form is not the essence of Holliday's invention. Form bears no more than an incidental relationship to the function that the device is designed to perform.

In Specialty Equipment & Machinery Corp. v. Zell Motor Car Co., 4 Cir., 193 F. 2d 515, the Court of Appeals for this Circuit had occasion to review at some length the doctrine of equivalents. The following language is from that opinion, 193 F.2d at page 518: "Very pertinent here with respect to the application of the doctrine of equivalents on the issue of infringement is the statement of the rule contained in Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, as follows: 'Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result.

" 'Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained. * * *

" 'Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape. Curtis, Patents 4th ed., sect. 310.' "

Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, presents a Supreme Court consideration of the doctrine of equivalents in which the foundation of the doctrine is repeated as being that one may not practice a fraud on a patent. The invention at stake was a formula for a flux used in welding. The accused substance substituted for a chemical named in the formula of the patentee's claim, a chemical from a different chemical group, which in combination with the patentee's other ingredients, produced the same reaction as that obtained with the patentee's complete formula.

The Court upheld the District Court's finding of equivalence in the accused formula and included the following language, 339 U.S. at page 609, 70 S.Ct. at page 856. "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for

every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was."

I have already pointed out the context in which "vertical" was used in Holliday's patent. I have already undertaken to show that his invention was a pioneer in the field. I now propose to consider the functional purposes served by the "vertical" elements in Holliday's device and the interchangeability of those elements that would have been perceived by a reasonably skilled person in the farm implement art.

In Holliday's illustrated machine and in the machines manufactured by Harrington and Long, primers are carried beneath a platform that passes over the top of the tobacco plants. Conveyor chains and members attached to the frame connect the upper and lower levels of the harvesters. The frame members and chains necessarily extend in an upward, downward direction, since they serve to connect a higher and lower plane. It is of no consequence to the maintenance of this connection that it varies from a true 90 degree vertical. No advantage is derived from the variation.

Holliday and Harrington aptly point out in their brief that: "There is one point in the travel of the tobacco-carrying chains where it is desirable that the chains travel in a substantially vertical direction, using vertical in the restricted sense. This is the place in front of where the primer or picker sits. When it is realized that the seat on which the picker sits can be moved up and down over a distance of some three or four feet, it can be seen why it is desirable that the chain in front of him be moving substantially in a specifically vertical direction in order that he not be moved either toward or away from the chain when the position of his seat is altered in an upward or downward direction. In this sense, there is a reason for a portion of the chain to move in a specifically vertical direction. An inspection of the Long patent shows that this portion of the chain in the Long machine also moves in a specifically vertical direction, for exactly the same reason. The most recent model of the Long machine has long stretches of vertical chains, and also vertical seat supports."

The quibble in this case over the word "vertical" brings to mind the Supreme Court's disposition of a similar contention regarding the word "parallel" found in Elizabeth v. Pavement Co., 97 U.S. 126, at page 138, 24 L.Ed. 1000. "It is objected, that the blocks of the Elizabeth pavement have not parallel sides, as prescribed in Nicholson's patent, by reason of the notch or groove in the side, into which the strips are fitted; but this notch or groove does not take from the blocks their general conformity to the requisition of the patent."

■ Turning now from Holliday's patent, let us consider the alleged infringement of Long's patent. Holliday and Harrington insist that Long's patent is completely void by reason of Title 35 U.S.C.A. § 102, which proscribes the issuance of a patent for an invention that has been in public use more than one year before the patent application date. As I indicated earlier, I do not find that the evidence lends any support to the theory that the use of Long's harvester between July 14 and July 28, 1953, was, in any sense, other than experimental.

The part of Long's patent alleged to be infringed is that which calls for "a conveyor * * * having a substantially horizontal run of substantial extent above said platform to facilitate removal of leaves from said conveyor, a series of clips carried by said conveyor

for receiving leaves to be conveyed, each clip being pivotally mounted so that it will be disposed in substantially the same angular position on the run where they are removed therefrom, * * *" A horizontal run of the conveyor chain and pivotal clips are not found in Holliday's patent. Long's harvester and the type made by Harrington have pivotal clips. Harrington extended the chain in a zig-zag manner.

I do not agree with Holliday and Harrington that Long's pivotal clips and chain arrangement are "mere structural changes which involve nothing more than the exercise of the skill of the art (and) do not rise to the dignity of invention". Thompson v. American Tobacco Co., 4 Cir., 174 F.2d 773, 777. They added a decided advantage to the operation of the harvesters in which they were incorporated. The two improvements, in combination, serve to give the looper more time to remove the tobacco from the chain.

And in addition to this is the presumption arising from the imitation of the patented article by the manufacturer of the alleged infringing device. As to this, we agree with what was said by Judge Hough, speaking for the Circuit Court of Appeals of the Second Circuit in Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277, 281: " 'The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think.' " Black & Decker Mfg. Co. v. Baltimore Truck Tire Serv. Corp., 4 Cir., 40 F.2d 910, 914. See also Ackermans v. General Motors, 4 Cir., 202 F.2d 642. Long's patent is not invalid for want of invention.

However, it is only a patent for improvements on Holliday's pioneer invention. An improvements patent is accorded only a narrow range of equivalents. Its scope is limited substantially to the devices disclosed in the specifications and drawings. Westinghouse Electric Corp. v. Bulldog Elec. Prod. Co., D.C., 106 F.Supp. 819, 870, and cases cited therein. But, to avoid infringement of a patent with even this narrow scope, the accused device must amount to more than merely a colorable departure from the invention. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147.

The Harrington imitation of Long's improvements cannot escape the accusation of infringement even under this easy test. The attempt made to "get off" Long's patent by altering the extended horizontal run of the chain from a straight line to a zig-zag line constitutes no more than an ineffectual subterfuge, ineffectual to add any advantage over Long's improvement, ineffectual to prevent a clear reading of the device on Long's claim. The pivotal clips are virtually indistinguishable. The finding that Harrington infringed Long's patent on these devices is further bolstered by substantial evidence of Harrington's hiring Davis and other employees from Long.

The monopoly of a pioneer patent and the monopoly of an improvement patent are mutually exclusive. Binney & Smith Co. v. United Carbon Co., 4 Cir., 125 F.2d 255. The making of patentable improvements does not avoid infringement. Acme Steel Co. v. Eastern Venetian Blind Co., D.C., 130 F.Supp. 459. The improver is liable as an infringer if he appropriates the basic invention without license. Temco Electric Motor Co. v. Apco Company, 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298. " 'Two patents may both be valid when the second is an improvement on the first, in which event, if the second includes the first, neither of the two patentees can lawfully use the invention of the other without the other's consent.' " Cantrell v. Wallick, 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017, as quoted in Wine Railway Appliance Co. v. Baltimore & O. R. Co., 4 Cir., 78 F.2d 312, 316.

In accord with the foregoing opinion, the defendants Long Manufacturing Company, Long Tobacco Harvesting Company, and W. R. Long will be enjoined from committing further acts of infringement of Holliday's patent No. 2,-672,248. Long Manufacturing Company, which produced the infringing harvesters, and Long Tobacco Harvesting Company, the sales outlet, will be liable for damages to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by these infringers. An accounting shall be made to aid in determining the amount of damages due.

It does not appear from the evidence that the defendant W. R. Long, though the principal owner of the defendant corporations, was merely using the corporations as a fraudulent cloak to carry on the infringement of others' patents; nor was his activity in connection with the plaintiff's patent carried on beyond the scope of his authority as a corporate officer. He is not personally liable to Harrington or Holliday for damages.

Similarly, Harrington Manufacturing Company, J. J. Harrington, and Jim Brown Holliday will be enjoined from committing further acts of infringement of Long's patent No. 2,704,-156. Harrington Manufacturing Company will be liable for damages to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by this infringer. An accounting shall be made to aid in determining the amount of these damages also.

J. J. Harrington is exempted from personal liability on the basis of his relationship with Harrington Manufacturing Company and with the infringement, which relationship I find to be parallel to that held by Long.

I find for neither plaintiff a flagrant, willful infringement that justifies increased damages. In addition to so finding, I deny increased damages as a matter of discretion.

Neither plaintiff may recover attorney fees.

Each party shall bear its own costs.