**UNITED CARBON CO., Inc., v. CARBON BLACK RESEARCH FOUNDATION, Inc.**

Civil Actions 2219, 2237.

District Court, D. Maryland.

Feb. 8, 1945.

Brown & Brune (by Hilary W. Gans), of Baltimore, Md., George P. Dike and George P. Towle, Jr., both of Boston, Mass., Arthur M. Smith, of Detroit, Mich., and Hugh M. Morris, of Wilmington, Del., for plaintiff.

Venable, Baetjer & Howard (by Harry N. Baetjer), of Baltimore, Md., and Pennie, Davis, Marvin & Edmonds (by Dean S. Edmonds and Roger T. McLean), of New York City, for defendant.

WILLIAM C. COLEMAN, District Judge.

These are consolidated patent suits involving alleged infringement of reissue patent No. 22,454, granted on March 7, 1944, to Binney & Smith Company, assignee of William B. Wiegand and Louis J. Venuto, relating to carbon black pellets and a process for making them. Binney & Smith Company, a New Jersey corporation, assigned its interest in the patent to The Carbon Black Research Foundation, Inc., a Maryland corporation, a wholly owned subsidiary of Binney & Smith Company, and the named defendant in the present suit.

Claims 1 and 2 (the only ones in suit) of this patent, which is a reissue of patent to Wiegand and Venuto No. 1,889,429, issued November 29, 1932, upon application filed December 2, 1927, were the subject of extended litigation, the chronology of which may be summarized as follows: In 1940, Binney & Smith Company brought suit against the present named plaintiff, United Carbon Company, Inc., a Maryland corporation, and an affiliate, United Carbon Company, in the United States District Court for the Southern District of West Virginia, charging infringement of claims 1 and 2 of this original patent. In a decision rendered February 17, 1941, that Court dismissed the complaint, holding these two claims of the patent invalid for lack of novelty, invention and definiteness, and also not infringed; and rendered merely a short opinion consisting of a categorical recital of findings of fact and conclusions of law. See Binney & Smith Co. v. United Carbon Co., D. C., 37 F.Supp. 779. Upon appeal, the Circuit Court of Appeals

(4 Cir.) reversed the judgment of the District Court on the question both of validity and infringement, and also denied a petition for rehearing. See 125 F.2d 255; 126 F.2d 3. Thereupon, upon petition of United Carbon Company for a writ of certiorari, the same was granted by the Supreme Court (316 U.S. 657, 62 S.Ct. 1269, 86 L.Ed. 1735), and in an opinion rendered December 7, 1942, the Supreme Court held claims 1 and 2 of the patent (which were the only claims in issue) invalid for indefiniteness, and stated (317 U.S. 228, 237, 63 S.Ct. 165, 170, 87 L.Ed. 232) that it had "no occasion to consider questions of novelty, invention, and infringement."

Thereafter, on January 6, 1943, the patentees, Wiegand and Venuto, filed an application in the Patent Office for a reissue of patent No. 1,889,429, and on March 7, 1944, the Patent Office granted reissue patent No. 22,454, the subject of the present proceeding. Shortly thereafter, the present named defendant, The Carbon Black Research Foundation, Inc., charged the present named plaintiff, United Carbon Company, Inc., with infringement of this reissue patent, and on May 3, 1944, the latter filed a suit in this Court (No. 2219) for a declaratory judgment against the former, that the reissue patent is null and void and not infringed. This was promptly followed, that is on May 10, 1944, by the filing by The Carbon Black Research Foundation, Inc., of a complaint (No. 2237) against the United Carbon Company, Inc., charging the latter with infringement of the reissue patent. After hearing, these two suits were consolidated by this Court, it being directed that the complaint for patent infringement should be considered as an answer to the complaint for a declaratory judgment; that the latter complaint should be considered an answer to the former, and that the United Carbon Company, Inc., should be treated as complainant in the consolidated proceedings. However, throughout this opinion it has seemed, for the sake of greater clarity, more appropriate to refer to the patent owner, namely, The Carbon Black Research Foundation, Inc., as the patentee, and United Carbon Company, Inc., as defendant.

In the specifications of the reissue patent, no changes whatsoever appear, except two very minor ones (hereinafter more specifically referred to); but substantial changes appear in the language of claims 1 and 2 which, as previously pointed out, were the only claims of the original patent in issue in the West Virginia litigation. Likewise, the parties have limited the present suit to claims 1 and 2 of the reissue patent, the other claims being process claims.

Claims 1 and 2 of the original patent read as follows:

"1. Substantially pure carbon black in the form of commercially uniform, comparatively small, rounded, smooth aggregates having a spongy or porous interior.

"2. As an article of manufacture, a pellet of approximately one-sixteenth of an inch in diameter and formed of a porous mass of substantially pure carbon black."

Claims 1 and 2 of the reissue patent are as follows:

"1. Substantially pure carbon black in the form of round smooth-surfaced aggregates less than one quarter of an inch in diameter, free from binders and porous throughout in such degree that approximately twice the number of pounds of aggregates of fairly uniform size can be placed in a container of a given size than is the case with the untreated black.

"2. Substantially pure carbon black in the form of round smooth-surfaced aggregates less than one-quarter of an inch in diameter, free from binders and porous throughout in such degree that approximately twice the number of pounds of aggregates of fairly uniform size can be placed in a container of a given size than is the case with the untreated carbon black the aggregates being sufficiently hard and flowable to prevent the formation of dust, and yet sufficiently friable and dispersible for use as a component in the manufacture of rubber and other products."

### The Effect of No Disclaimer.

Before the present proceeding came on for hearing on the merits, the defendant filed a motion for summary judgment on the following grounds: (1) That no disclaimer of claims 1 and 2 of the original patent has ever been made or filed by the patentees or their assigns, notwithstanding the fact that the patentees, in their affidavits attached to their application for a reissue patent, acknowledged the invalidity of these claims; (2) that claim 3 of the original patent was included as claim 7 in the application for a reissue; that the Patent Office rejected claim 7, whereupon applicant for the reissue patent instructed the Patent Office to cancel claim 7, yet no

disclaimer of claim 3 has ever been made or filed; and (3) that the reissue patent does not correct the invalidating defects declared by the Supreme Court to exist in the original patent. However, after full hearing of this motion, we rendered an oral opinion to the effect that under the existing circumstances, compliance with the disclaimer provisions of the patent laws, 35 U.S.C.A. § 65, was not a condition precedent to a valid granting of the reissue patent under the reissue requirements of the patent laws, 35 U.S.C.A. § 64, in so far as claims 1 and 2 are concerned; and that as respects claim 3, since the Patent Office had concluded that it acted erroneously in granting this claim of the patent, and the applicant merely acquiesced therein, these circumstances should not be used to the detriment of the applicant.

We now reaffirm our reasons for overruling the motion for summary judgment, and deem it appropriate to include in this opinion a somewhat more detailed statement of these reasons than was given in our oral opinion.

The motion for summary judgment raised two questions: (1) Whether, the Supreme Court having held claims 1 and 2 of the original patent invalid because too indefinite, it was necessary for the patent owner to file a statutory disclaimer under the provisions of R.S. § 4917, 35 U.S.C.A. § 65, in addition to applying under the provisions of R.S. § 4916, 35 U.S.C.A. § 64, for a reissue patent with more definite claims; and (2) whether claim 3 of the original patent covered the same subject matter as claims 1 and 2, and therefore was required to be disclaimed.

The decision of the Supreme Court holding claims 1 and 2 of the original patent invalid was rendered December 7, 1942, and its mandate issued on January 9, 1943. The application for the reissue of the patent which resulted in Reissue Patent No. 22,454 involved in the present suit, was filed on January 6, 1943, that is to say, within thirty days of the Supreme Court's decision, and three days before its mandate issued. The prosecution of the reissue application in the Patent Office proceeded in the usual manner and the reissue patent was granted on March 7, 1944. Thus, clearly there was no delay or laches in applying for and obtaining the reissue patent.

It is important to note that R.S. § 4916, 35 U.S.C.A. § 64, the reissue statute, and R.S. § 4917, 35 U.S.C.A. § 65, the disclaimer statute, provide alternative but not *co-extensive* remedies for a patentee who claims "more than that of which he was the original or first inventor or discoverer", R.S. § 4917, and for a patentee who claims "as his own invention or discovery more than he had a right to claim as new", R.S. § 4916, in each case if caused by "inadvertence, accident, or mistake, and without any fraudulent or deceptive intention."

By the language of the disclaimer statute (which it is not deemed necessary to quote) a disclaimer constitutes a retroactive amendment of the patent, effective as of the date of grant of the original patent. That is to say, a claim amended by disclaimer is to be construed as though the disclaimed matter had never appeared therein. Dunbar v. Myers, 94 U.S. 187, 24 L.Ed. 34. Thus, there may be infringement even before the amendment. Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005. On the other hand, by the language of the reissue statute (which it is not deemed necessary to quote) amendments by reissue are effective only as of the date of surrender of the original patent and the granting of the reissue patent, except to the extent that identical claims are carried from one patent into the other. Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332. Thus, the advantages of amending claims by disclaimer, rather than by reissue, are so great that patentees generally prefer to amend bad claims by disclaimer rather than by reissue, in order to preserve causes of action for past infringement. It is asserted on behalf of the patentee in the present case that if claims 1 and 2 had been of a type amendable by disclaimer and had in fact been amended by an interpretative, or as is commonly called a "chiseling" disclaimer, there would have been preserved a cause of action against defendant for infringement for a long while antedating such amendment—a valuable right which the patentee would not have freely discarded. See Minerals Separation, Limited, v. Butte & Superior Mining Co., 250 U.S. 336, 39 S.Ct. 496, 63 L.Ed. 1019, and Milcor Steel Co. v. George A. Fuller Co., supra.

What the patentee did in the present case is the generally recognized practice. In fact, we have been referred to no case in which a reissue patent has been

held invalid for failure of the patentee to invoke, in addition to the provisions of the reissue statute, those of the disclaimer statute. In Motion Picture Patents Co. v. Laemmle, 214 F. 787, a decision of the District Court for the Southern District of New York, which was not appealed, it was squarely held that such is in fact unnecessary. There the Court said, after a comprehensive review of the reasons for, and the distinctions between the two statutes (214 F. 787, at page 797):

"The failure to disclaim did not of itself render the patent void. It simply resulted in closing the door to recovery for past damages and injunctive relief at that time, because complainant itself closed that door when the patent was surrendered and reissue 13,329 was applied for.

"It is important throughout, to keep in mind the distinction between the purposes and results of the two statutes. It will be noted that the reissue statute does not contain any admonition as to neglect or delay, but the courts have worked out and applied certain principles which seem simple enough when stated. The difficulty lies, not in an understanding of the principles, but in their application to any particular set of facts."

■ Indeed, the remedy of disclaimer was not only not required to be used in the present case, but its use would have been inappropriate. There was nothing to disclaim, because a disclaimer of the two claims held invalid for indefiniteness would have left the patentee with only process claims, and with claim 3 which covered a different type of product, not being manufactured by the patentee, and without any claims covering the product which the Circuit Court of Appeals had held to represent a pioneer invention. Thus, where it is necessary to revise the specifications or a claim, or both, in any way except by excising on the basis of separability set forth in the specifications, procedure by way of reissue is the only appropriate remedy. As was said in Hailes v. Albany Stove Co., 123 U.S. 582, at page 587, 8 S.Ct. 262, at page 265, 31 L.Ed. 284, a disclaimer must cover "a separate claim in a patent, or some other distinct and separable matter, which can be exscinded without mutilating or changing what is left standing." See also Milcor Steel Co. v. George Fuller Co., supra; Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., supra; Rosemary Mfg. Co. v. Halifax Cotton Mills,

Inc., 4 Cir., 288 F. 683; General Motors Corp. v. Rubsam Corp., 6 Cir., 65 F.2d 217; Fruehauf Trailer Co. v. Highway Trailer Co., 6 Cir., 67 F.2d 558.

■ One who invokes the benefits of the disclaimer statute must do so with reasonable promptness after he knows or has reasonable ground for knowing that his patent contains invalid claims. This is because, as we have pointed out, greater liberality is given to one who disclaims than to one who seeks a reissue, and as an offset to this greater liberality, the one disclaiming is expressly required by R.S. § 4922, 35 U.S.C.A. § 71, to proceed promptly under its provisions; whereas, under the reissue statute, only the equitable doctrine of laches applies. However, the time within which one must disclaim varies in different Circuits. In this, the Fourth Circuit, no specific time limit has been set. In some Circuits, thirty days has been held a proper limit, in others sixty. In General Chemical Co. v. Standard Wholesale Phosphate & Acid Works, 4 Cir., 77 F.2d 230, certiorari denied 296 U.S. 606, 56 S. Ct. 122, 80 L.Ed. 430, rehearing denied 296 U.S. 663, 56 S.Ct. 177, 80 L.Ed. 473, decisions applying the different rules are collected and discussed. In that case the Circuit Court of Appeals for this Circuit held (reversing this Court, 8 F.Supp. 265) that a patent owner's failure to file a disclaimer of an invalid claim until thirty-eight days after the Supreme Court had denied certiorari to review a judgment of the Circuit Court of Appeals of the Third Circuit, holding a claim invalid, was not an unreasonable delay, and therefore did not invalidate a reissue patent, application for which had been filed, especially since during the thirty-eight day period, proceedings were pending in another court to enjoin the patent owner's suit. As the Court there said (77 F.2d 230, at page 233): "the owner of the patent had to consider not merely the question of a disclaimer but also the question of the application for a reissue of the patent under the provisions of Rev.St. § 4916, 35 U.S.C.A. § 64. As a matter of fact, the Patent Office subsequently granted a reissue, and while we decide the pending case on the assumption that the filing of the application for reissue did not obviate the necessity of making a disclaimer, nevertheless, the problem presented by the application for the reissue was a circumstance to be viewed in connection with all the other circumstances of

the case in determining the question of unreasonable delay." Then, the Court concluded as follows: *"We do not decide the question whether a disclaimer is necessary in those cases in which an application for reissue may properly be made; nor do we decide whether in such cases the patentee has an alternative remedy either by way of disclaimer, under 35 U.S.C.A. § 65, or by an application for a reissue, under 35 U.S.C.A. § 64,* in view of the fact that in both sections there is reference to the situation which exists when through inadvertence an inventor has claimed more than that of which he was the original inventor." (Italics inserted.)

Thus, it will be seen that the Court of Appeals in the case just analyzed, did not have before it the precise question here presented. Counsel for defendant in the present case have laid much emphasis upon the language employed by this Court in its opinion in the General Chemical case, supra, as follows (8 F.Supp. 265, at page 270): "Plaintiff in effect argues for suspension, at the whim of the party that is required to disclaim, of any requirement so to do upon the plea that an application for a reissuance of the patent is pending. As a matter of fact, in the present case, there was no such valid application pending at the time the disclaimer was filed because, although reissue papers were filed on April 7, 1934, six days before the disclaimer was filed, they were not accepted by the Patent Office as a valid application because defective in form and substance, and as a result the application for reissue was not considered as validly filed until June 16, 1934. This fact alone might be a sufficient answer to plaintiff's contention. But the distinction between disclaimers and reissues is fundamental. Resort to the reissue provisions of the law do not dispense in a suit of this kind with the obligation seasonably to disclaim. The defect which the disclaimer is intended to remove is one which in its nature is fatal to the patent. In the public interest, a patentee may not knowingly hold himself out as asserting invalid claims, once he has discovered that they are without foundation. That is to say, the sole purpose of a disclaimer is to amend excessive claims by eliminating from them the separable excess; while, broadly speaking, the sole purpose of a reissue is to correct faults of statement in the description and claim of the original patent."

While, of course, whatever this Court said in its decision in the General Chemical Company case is superseded by the decision of the Circuit Court of Appeals, we do not believe that upon the facts as there presented, our above quoted statements are inconsistent with the position here taken. In any event, however, it is entirely clear from the passage which we have just quoted from the opinion of the Circuit Court of Appeals in the General Chemical Company case, that that Court expressly refrained from ruling upon a state of facts such as we now have before us.

We find nothing contrary to our conclusion in any of the cases upon which defendant relies in support of its motion. For example, Ensten v. Simon Ascher & Co., 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453, and Marconi Wireless Co. v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731, did not deal with the question of the resort to the reissue statute as an alternative to the disclaimer statute, but with the timeliness of disclaimers.

Turning to the second question involved in defendant's motion for summary judgment, namely, whether claim 3 of the original patent was required to be disclaimed, we, likewise, feel that there was no irregularity in defendant's failure to disclaim it.

Claim 3 was distinguishable from claim 1 and 2 of the original patent by virtue of its requirement that there be a difference in density in the inner and outer portions of the pellet. This claim read as follows: "A carbon black pellet formed of soft particles, the outer portion of the pellet being smooth and the outer portion being slightly denser than the inner portion." No contention has ever been made, either in the present or in the West Virginia suit, that such a product is covered by the prior art. Thus, there has never been any judicial determination respecting the validity or invalidity of claim 3 and, accordingly, no reason why it should have been disclaimed from the original patent. Defendant relies upon Maytag Co. v. Hurley Mach. Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264, however, as authority to the contrary. That case holds that where claims have been found to be invalid and the patentee expunges them by resort to the disclaimer statute, he must disclaim not only the claims held invalid, but also any other claims in the patent *not distinguishable therefrom,* otherwise the entire patent is

void. The rule of this case does not apply where there *is* a distinction between the claims adjudicated to be invalid and disclaimed, and those not adjudicated and not disclaimed. Counsel for the patentee point out, not without considerable force, that the product of claim 3 is to be treated as a forerunner of products covered by patents granted subsequently to the original patent in suit, such as Billings & Offutt Reissue Patent No. 19,750, Offutt Patent No. 2,134,950 and Billings & Offutt Patent No. 2,039,766, which embrace pellets with core and shell structures.

■ It is contended on behalf of defendant that the fact that claim 3 of the original patent was canceled in the prosecution of the reissue application was an irregularity and did not dispense with the necessity for disclaiming it. But we believe that this contention also is without merit. In the course of prosecution of the reissue application, claim 3 of the original patent, which became claim 7 of the reissue application, was canceled because of its rejection by the Patent Office. Thus, by disposing of the claim in this manner, the patentee was doing nothing more than following the rules of practice of the Patent Office in relation to reissue applications, which provide that they are to be subjected to re-examination in their entirety. See Rule 90, 35 U.S.C.A. Appendix. In short, when, upon re-examination, the Patent Office concludes that it acted erroneously in granting a claim of a patent, that fact should not be used to the detriment of the patentee. The abandonment of claim 3, while voluntary, was not an admission that it had been included in the original patent "by inadvertence, accident or mistake", but because the Patent Office found that it should be rejected.

### Analysis of Product Claims 1 and 2 of the Reissue Patent.

Upon denial of defendant's motion for summary judgment, the case proceeded to trial upon the merits, it being stipulated by the parties, with approval of the Court, that the transcript of the record before the Supreme Court in the West Virginia case, together with the exhibits therein referred to, should be treated as evidence in the present suit.

Carbon black, which has been manufactured in this country from natural gas for approximately 75 years, is a very light, fine powder, whose particles, as disclosed by the electron miscroscope, are as small as one millionth of an inch in diameter, and it possesses characteristics which render it particularly valuable at the present time as a reinforcing agent for rubber; that is to say, it increases the cohesion of the rubber particles, thus giving to automobile tires an increased abrasion resistance. These characteristics also make it valuable in the manufacture of other rubber compositions, phonograph records, various wax and rosin compositions, paints and lacquers, printers ink and carbon paper. Such characteristics, as stated in the specifications of the original patent and also the reissue patent now in suit, are "its extremely fine state of subdivision, together with the very essential property of being readily and uniformly dispersed in rubber, waxes, oils and the like."

There are two methods used for obtaining carbon black: First, the channel method, whereby natural gas is burned with insufficient oxygen and the smoke is directed against the side of a channel of iron, which is cooled and the soot is thus condensed and is then scraped off into a bin. Second, the furnace method, whereby natural gas is burned in a cylindrical retort with insufficient oxygen, and the soot thus produced is then passed into separators.

The carbon black weighs three or four pounds per cubic foot when it comes from the channel irons, and is somewhat heavier when made by the furnace process. After its density has been increased by agitation such as that involved in the process of the patent in suit, it may weigh as much as ten or twelve pounds to the cubic foot, depending upon the extent and character of the agitation.

As early as 1915, it was well recognized that the use of carbon black in the manufacture of rubber for automobile tires greatly improved the durability of the tires, but the dust created by its use, in the form of extremely fine powder, in the process of tire manufacture, created a very serious problem because of the annoyance to workmen handling the material and breathing the dust. Therefore, a great deal of thought was given to finding a form of carbon black from which the dust nuisance would be eliminated. A large number of patents were applied for and issued. Some involved granulation of the carbon black by the use of binders such as oil or tar. Others attempted wetting the carbon black with water or other liquids and then drying it out, but after drying, the dust nuisance

was revived and the particles did not completely disperse.

The problem may best be stated by quoting the following from the specifications of the reissue patent in suit:

"Carbon black, as manufactured, is such a very light fine powder that normally ten pounds, or less, occupy a package of one cubic foot. It is accordingly expensive to pack, ship and store such a light bulky material, and handling the light powder causes it to fly in the air to such an extent that there is substantial loss of material, and an annoyance to workmen handling the material and breathing the dust.

"Numerous attempts have been made to overcome these objectionable properties of carbon black and render it denser and less dusty, but all such attempts heretofore have greatly changed the very essential physical properties of the carbon black which make it industrially valuable. Thus, the carbon black may be made into a paste with water or other volatile liquid such as gasoline, solvent naphtha, xylene, turpentine, carbon tetrachloride and the like, and the volatile liquid then distilled or evaporated, but the resulting cake is hard, the carbon particles tend to hold together in chunks, and they no longer disperse readily and uniformly as for example in rubber compositions. Apparently the state of aggregation of the carbon particles has been changed in such altered carbon blacks, and, as a matter of fact, the industrially essential physical properties, namely, easy and uniform dispersion, are so much impaired that such processes have never been a commercial success.

"We find that when the original carbon black is added to a liquid to form a paste and the liquid slowly distilled or evaporated, such treatment causes changes which are associated with a free meniscus, i. e., vortices, surface tension adhesion, settling, volume contraction of the black, and a very persistent adhesion of particle to particle. The result is the clumping together of the carbon and the loss of dispersibility, as referred to above. This change of colloidal properties or loss of dispersibility may be mitigated or avoided by drying very quickly with violent agitation, drying by quickly removing the liquid by absorbing it into the walls of a small porous container, or by displacing the original liquid by another in such a manner as to avoid free suspension of the particles, in a liquid phase."

The patentees assert in their specifications that the main object of their invention "is to secure carbon black having the desired dispersive properties, greater density, freedom from dust, freedom from gritty particles, less absorbed or occluded gases, reduced oil absorption than the ordinary powder form, and capable of considerable handling without crushing or dusting.

"We have discovered that we can improve carbon black as to all or substantially all of the above mentioned properties without deleteriously affecting any of the properties essential to its satisfactory industrial use, such as softness and dispersive qualities, and by a process which included the simultaneous or successive treatment of the carbon black with two immiscible liquids, the second liquid having greater attraction for or greater ability to wet the particles.

"This process, if carried out under certain conditions, causes the carbon black to form into pellets which are hard enough to stand any ordinary shipment or handling without dusting, flying or breaking down, and which at the same time are easily crushed by moderate pressure, as between the fingers or by the pressures commonly employed in the rolls of rubber compounding machinery, printers' ink mixers and the like. The crushed particles have substantially their original softness and the material disperses freely without leaving any particles of undispersed carbon in the material.

"While the pellet form is a very convenient form of the carbon black, the shape of the particles is not the most important characteristic of this novel carbon black. The properties enumerated above may be incorporated into the black in the form of flakes or the pellets or flakes may be crushed and pressed into blocks without seriously affecting its valuable dispersive properties."

The description of the patent process and the resultant product contained in the specifications is as follows:

"The carbon black is first mixed with water so as to form a comparatively thin paste with most of the occluded gases driven out. After thorough mixing gasoline is added and the whole mass thoroughly agitated. As a result substantially all of the carbon black floats on top of the water in the form of pellets and may be readily removed by filtering, decanting or the like.

These pellets may then be dried to remove the absorbed gasoline and such moisture as there may be contained therein. Care should be taken to insure the complete wetting of the particles with the water, as otherwise the particles will be wet directly by the gasoline and in drying harsh particles may result. In the drying operation the carbon black retains its globular, ball-like or pellet form.

"On the first addition of gasoline to the black and water paste, with agitation, the mass seems to thicken like an emulsion; then on further shaking, it seems to flocculate into granules; as the agitation goes on, a slight creaming to the top of the pellets or a scum takes place, then gradually the pellets form and float to the top. The end point is reached when the water below is free of carbon, that is, is clear. [In the original patent this sentence read: "The end point is reached when the water below is free of carbon-clear."]

"The pellets are then screened off by any of the various methods, placed in an oven or a recovery apparatus and freed from solvent water. It has been found that by use of this method the drying has little or no harmful effect upon the particle. Low temperature drying, and high temperature drying (around 400° Fahrenheit) leave the particle in a good soft condition. There are however various factors which will influence this.

"If there is no organic residue decomposed by heat, there will be no binding of the particle. If there is, a harshness will result due to the decomposition or gumming of the residue. If too much gasoline is used, the particles will compact to comparatively hard pellets. If there is too much water and not enough gasoline, an inferior product will result.

"The control however of the above process does not necessarily have to be delicate. A rather wide margin of safety exists.

"Merely as an example of the relative proportions which we have found to operate satisfactorily, we give the following by weight:

|  |  |  | Parts |
|---|---|---|---|
| Carbon |  |  | 5 |
| Water | 40 | to | 80 |
| Gasoline | 7 | to | 9 |

"In carrying out our improved process with these proportions, the mass may be thoroughly shaken or otherwise agitated for about five minutes and the resulting pellets will be of about one-sixteenth of an inch in diameter and will be fairly uniform in size.

"The pellets are very porous, of substantially spherical or globular form, have a smooth somewhat lustrous outer surface which is not easily broken by handling, are more compact than untreated carbon, are fragile under light pressure, and may be easily reduced to soft minute particles which cannot be told from the original particles except that possibly they have a more unctuous feel. They somewhat resemble lead shot and may be rolled in the hand without dirtying or dusting. Apparently the outer surface portion or shell of each pellet is slightly more compact than the inner part, but still porous.

"In shipping or storing, we find that approximately twice the number of pounds of these pellets can be placed in a container of a given size than is the case with the untreated carbon black. Thus, expense is reduced for shipment or storage."

Summarized briefly, and shorn of technical phraseology, it will thus be seen that the alleged invention consists of producing small, rounded, dustless carbon black pellets, easily handled and yet which will readily disintegrate into their original minute particle state when subjected to such treatment as that involved in the manufacture of rubber tires.

It is to be noted that the two product claims which are the subject of the present suit are identical in language except that claim 2 embraces at the end of the claim, an additional description of the carbon black pellets as follows: "the aggregates being sufficiently hard and flowable to prevent the formation of dust, and yet sufficiently friable and dispersible for use as a component in the manufacture of rubber and other products." This is the very language which the Supreme Court employed in its opinion in stating the requisites, in addition to dispensing with the use of a binder, in order to establish invention and infringement. United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 230, 63 S.Ct. 165, 87 L.Ed. 232.

As already stated, the Circuit Court of Appeals for this Circuit, in Binney & Smith Co. v. United Carbon Co., supra, decided that claims 1 and 2 of the patent, of which claims 1 and 2 of the patent in suit are a reissue, in addition to holding

that they were infringed, were valid in every respect that is to say, when tested by the established requirements of definiteness, novelty and invention, and the Supreme Court, while reversing the Circuit Court of Appeals, confined its decision exclusively to the question of the definiteness of the claims, holding them bad for indefiniteness, and declined to rule upon questions of novelty and invention as well as infringement. As a result, we are urged by the parties to the present proceeding to treat the situation, thus created by the prior litigation, as leaving this Court entirely unrestricted in the extent to which it may consider *all* questions of whatever kind touching not merely upon the sufficiency of the specifications and claims of the reissue patent, but also, upon validity and infringement. This position may be sound. But, quite apart from the question of any possible restrictions that may be placed upon this Court by reason of the prior litigation, in considering identical matters involved in questions of patent validity, other than those involved in the question of the sufficiency of the claims and the specifications of the reissue patent, this much is clear, namely, that whatever else may be said for or against the validity of the two reissue claims now in suit, they cannot be allowed to stand unless they have been cured of the vagueness which the Supreme Court has declared was characteristic of their predecessors in the original patent. Thus, it seems appropriate to consider and determine this question first of all.

Also, as already stated, there have been no changes in the patent specifications which either party contends are material to the issues here involved, and only two minor changes, one of which we have noted in the parts of the specifications which we have already quoted. The other minor change consists of omitting the following sentence found in the specifications of the original patent: "We have obtained very satisfactory pellets from magnesium carbonate and also from zinc oxide by use of the process exactly as described above, although benzol has been used instead of gasoline." However, very material changes appear in the language of claims 1 and 2 as reissued. These two claims, as they appear in the original patent and also in the reissue patent, have already been quoted in full in this opinion and we will not re-quote them, but will turn at once to a consideration of the reasons given by the

Supreme Court for finding these claims in the original patent invalid for indefiniteness. These reasons may best be understood, we think, by quoting at some length from the Court's opinion, as follows (317 U. S. 228, at pages 232–236, 63 S.Ct. 165, at page 167, 87 L.Ed. 232):

"Section 4888 of the Revised Statutes, 35 U.S.C. § 33, 35 U.S.C.A. § 33, requires that the applicant for a patent 'shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery.' As the Court recently stated in General Electric Co. v. Wabash [Appliance] Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 901, 82 L. Ed. 1402:

" 'Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must "inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not." The claims "measure the invention." * * * In a limited field the variant must be clearly defined.'

"The District Court found that the claims did not meet these requirements, and the Circuit Court of Appeals held that they did. Much testimony was directed to this question at the trial, and it has been discussed in the briefs and argument in this Court. Petitioner seeks reversal on the grounds of anticipation and non-infringement. The scope and sufficiency of the claims in suit necessarily present themselves as preliminary problems in the resolution of these ultimate issues. The courts in determining the questions of invention and infringement brought to them by respondent, no less than the parties-litigant, need and may insist upon the precision enjoined by the statute. To sustain claims so indefinite as not to give the notice required by the statute would be in direct contravention of the public interest which

Congress therein recognized and sought to protect. Cf. Muncie Gear Works v. Outboard, Marine & Mfg. Co., 315 U.S. 759, 62 S.C. 865, 86 L.Ed. 1171.

"Here, as in many other cases, it is difficult for persons not skilled in the art to measure the inclusions or to appreciate the distinctions which may exist in the words of a claim when read in the context of the art itself. The clearest exposition of the significance which the terms employed in the claims had for those skilled in the art was given by the testimony of Weigand, one of the patentees, whom respondent called as its witness. Weigand was employed as Director of Research of the Columbian Carbon Company, whose stock respondent owned, and for whom respondent acted as sole selling agent. His testimony in this respect was given principally upon cross-examination, but it was in no wise impeached or contradicted, and is borne out by that of other witnesses. From it we learn that 'substantially pure' refers, not to freedom from ash and other impurities, but rather to freedom from binders; 'commercially uniform' means only the degree of uniformity demanded by buyers; 'comparatively small' is not shown to add anything to the claims, for nowhere are we advised what standard is intended for comparisons; 'spongy' and 'porous' are synonymous, and relate to the density and gas content of aggregates of carbon black. Although sponginess or porosity is not a necessary attribute of a friable substance, it does contribute to the friability of aggregates of carbon black. It is of value only in that regard. A spongy or porous aggregate of carbon black may be so friable as to permit of the formation of dust; and, on the other hand, it is conceivable that it might not be sufficiently friable to mix satisfactorily with other substances such as those used in the manufacture of rubber products. The correct degree of friability can be ascertained only by testing the performance of the product in actual processes of manufacture of products of which carbon black is a component. A 'pellet' of carbon black is 'a spheroidal shaped aggregate that has substance and strength to it.' For 'strength' 'we have this rough and ready test: Does it survive under gentle rubbing of the fingers? I would not say that it is an adequate test to predicate rubber behavior on, but it is a rough and ready test'; and if it responds to that test it is a pellet within the meaning

of the claim. Finally, what on first impression appears to be reasonable certainty of dimension disappears when we learn that 'approximately one-sixteenth of an inch in diameter' includes a variation from approximately 1/4th to 1/100th of an inch.

"So read, the claims are but inaccurate. suggestions of the functions of the product, and fall afoul of the rule that a patentee may not broaden his claims by describing the product in terms of function. Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 256–258, 48 S.Ct. 474, 478, 479, 72 L.Ed. 868; General Electric Co. v. Wabash Corp., supra, 304 U.S. at pages 371, 372, 58 S.Ct. at pages 902, 903, 82 L.Ed. 1402.

"Respondent urges that the claims must be read in the light of the patent specification, and that as so read they are sufficiently definite. Assuming the propriety of this method of construction, cf. General Electric Co. v. Wabash [Appliance] Corp., supra, 304 U.S. at pages 373–375, 58 S.Ct. at pages 903, 904, 82 L.Ed. 1402, it does not have the effect claimed, for the description in the specification is itself almost entirely in terms of function. It is therefore unnecessary to consider whether the rejection of certain claims by the Patent Office might in turn deprive the specification of any curative effect in this regard. * * *"

■ It will thus be seen that the Supreme Court found the claims too indefinite in virtually all important respects, namely (1) purity; (2) size; (3) shape; (4) strength; (5) porosity; and (6) uniformity.

Defendant claims that in none of these respects have the invalidating defects been cured by the language employed in the reissued claims now before us. With this we cannot agree, and just as the Supreme Court, in testing the original claims, found (317 U.S. 228, at page 233, 63 S.Ct. 165, at page 168, 87 L.Ed. 232) that "the clearest exposition of the significance which the terms employed in the claims had for those skilled in the art was given by the testimony of Weigand [Wiegand], one of the patentees," we, in turn, believe that the testimony of this same person in the present case, gives the clearest exposition of the character and extent of the changes embodied in the reissued claims. It has not been impeached or contradicted, just as the Supreme Court said (317 U.S. 228, at page 233, 63 S.Ct. 165, at page 168, 87 L.Ed. 232) that this same witness' testi-

mony "was in no wise impeached or contradicted," and we are satisfied that to require still more definite explanation of any one or more of the six major characteristics of the product covered by claims 1 and 2 would be to impose a duty which the statutory requirement of particularity and distinctness in claims does not, and was never intended to impose.

First, as to purity—that is "substantially pure carbon black" as required by both claims of both the original and the reissue patent. But in the latter, the term is clarified by the requirement, not previously stated in the claims, that the product shall be "free from binders." In addition, as Mr. Wiegand testified, the term "substantially pure" means to the rubber tire industry, simply freedom from all impurities, such as ash content, except in such small amounts as to have no effect upon the behavior of the carbon black in the rubber, which is well understood in the rubber tire industry to be a small fraction of 1%.

Second, as to size. Originally, claim 1 gave no description of size except the words "comparatively small"; and claim 2 used the words, "of *approximately* one sixteenth of an inch" (italics inserted). The reissue claims, however, both prescribe that the pellet shall be "less than one quarter of an inch in diameter." Mr. Wiegand pointed out in his testimony in the present case that no one in the industry has dared to question the desirability of having the pellet aggregates of just as small a size as possible, provided they embody the other necessary characteristics; and that one quarter of an inch was adopted as the maximum size, because, as he said, when you approach that size, all those in the industry are agreed that the practical limit is about reached, from the point of view of stability.

An examination with the naked eye of the samples placed in evidence immediately discloses that all of the aggregates are well within the size limit of the claims.

Third, as to shape. Originally, claim 1 described the aggregates as "rounded, smooth aggregates"; and claim 2 omitted entirely any description of shape. On the other hand, both of the reissue claims describe the shape of the aggregates as "round smooth-surfaced". Mr. Wiegand testified that while, of course, the optimum desired in the industry is a perfect sphere, as respects every aggregate, such is not possible in very large commercial production, saying "my idea of what is round is that it is mostly round, or predominatingly round or more round than anything else. Whether it is egg-shaped or pear-shaped or any other kind of a distortion of a sphere, in my judgment does not alter the straight-forward meaning of the word 'round'. * * * When you ask me what 'round' means, my answer would be round enough and free enough from any of these departures—prevailingly round."

As to "smooth-surfaced", Wiegand gave as an interpretation "smooth and not full of prominent irregularities," that is, devoid of irregularities of such extent that the aggregates would tend to interlock with each other and would not flow freely.

The Court's own examination of the samples in the course of the trial, under the microscope, confirmed this testimony. Nearly all the pellets were spherical and, generally speaking, quite smooth-surfaced.

Fourth, as to strength. This factor is of course directly related to the degree of friability, that is to say, the ease with which the pellets crumble, or break; and also to the degree of porosity. The Supreme Court found that under claims 1 and 2, as originally drawn, "The correct degree of friability can be ascertained only by testing the performance of the product in actual processes of manufacture of products of which carbon black is a component." 317 U.S. 228, at pages 233, 234, 63 S.Ct. 165, at page 168, 87 L.Ed. 232. However, we believe that the very definite requirement as to porosity which has been added to both claims (and about to be referred to herein) describes, with requisite precision, the strength factor, quite apart from the further definition as to hardness, flowability and friability which has been added to claim 2 as reissued.

Fifth, as to porosity. In the original claims what was said was (claim 1) that the aggregates had "spongy or porous interior", and (claim 2) that the pellet was "formed of a porous mass"; whereas, in both the reissue claims, "porosity" is described as meaning "porous throughout in such degree that approximately twice the number of pounds of aggregates of fairly uniform size can be placed in a container of a given size than is the case of the untreated carbon black". In addition, to claim 2 is added the descriptive language which we have heretofore referred to.

On the question of porosity, Wiegand explained that it was necessary to refrain from an extreme "research-minded approach" to that question. Carbon black, he explained, is made with 98% air and 2% carbon. It is a fluffy material as it falls from the channel, and the best measure of porosity is the extent to which the air has been removed, and the material made to approach a solid. He said "we have to have a bench-mark—something with which to compare the porosity of the successful pellets. There was not any bench-mark available except one thing, which was the previous package of carbon black, or uncompressed carbon black, so called, which I believe has always been shipped for many years in a 17 x 34" bag which weighed 12 pounds, which was stuff that was previously used in the rubber industry. Whether compressed or not, it was the same package and the same bag. We had a density of 12½ pounds. That was dusty and it was to that reference or bench-mark that we hitched our porosity criteria. So, when you say that it is porous to such a degree that approximately twice as much can be placed in a container—if I may be very elemental about it—it simply means this, that the old black, or loose black, or uncompressed black which flew and was dusty, if we had a cubic foot and the weight was 12½ pounds, if we empty one of those bags and pour in our new pellets, that would be 25 pounds instead of 12½ pounds, thereby giving effect to the densification and serving as a criterion of the degree to which our pellets had been hardened up. This is my rather rough and ready way of interpreting what I consider about the only available quantitative way of defining this porous property." Upon having his attention called to the specific criticism that the Supreme Court had made of his testimony in the former case respecting sponginess or porosity, Wiegand asserted that by adding to the claims, as originally drawn, a well defined requirement as to density which we have just considered under the characteristic of "strength", from every reasonable point of view the objection on the basis of vagueness which the Supreme Court made to the language of the original claims has been amply met.

Lastly, as to uniformity. The original claims omitted any express reference to uniformity, whereas the reissue claims both require "aggregates of fairly uniform size." Suffice it to say on this point that we are satisfied, from the careful examination which we made during the trial, not only with the naked eye, of the various samples, and photographs of samples of the pellets, but of the samples under the microscope, that the aggregates are unquestionably "fairly uniform" in size.

█ Finally, it seems unnecessary to allude further to the fact that the specifications of the patent in suit disclose no material change over the specifications of the original patent, because it is the claims that must define the invention, and although in some cases a claim's validity may be assisted by some reference to the method of production, a patentee must clearly distinguish his product other than by reference to the process by which he produces it. This is what the Supreme Court, in effect, said in invalidating the original claims (317 U.S. 234–237, 63 S.Ct. 168–170, 87 L.Ed. 232), and we are satisfied that this requirement has been amply met by the claims as reissued.

### Prior Art Patents.

██ We turn now to the question of the validity of claims 1 and 2 of the reissue patent in suit, from the point of view of what has been disclosed by prior art patents. The defendant does not attack the validity of these claims on the ground of any prior disclosure except as appears from prior art patents.

As previously stated herein, it may be assumed that we are not obligated to adopt the findings of the Circuit Court of Appeals for this Circuit in the West Virginia case, because of the Supreme Court's reversal of the decision of that Court with respect to the original patent, even though the reversal was confined to the question of indefiniteness of the claims, since we are now dealing with a different, namely, the reissue patent although the parties in the present suit are the same as those in the prior suit except that the Carbon Black Research Foundation appears in the place of Binney & Smith Company as a wholly owned subsidiary of the latter; and since much of the testimony in the present case was not presented in the previous case. Nevertheless, we are satisfied that nothing has been disclosed in the hearing before us which warrants a different conclusion with respect to the prior art patents than that which the Circuit Court of Appeals reached in the West Virginia case.

We entertain no doubt of the novelty disclosed by the patent in suit. The weight of the credible evidence is that the patent did much more than merely discover a new use for an old thing. It is, of course, true that absence of invention is not overcome merely by evidence of utility or commercial success, even though a long felt want be satisfied, but as was said by the Circuit Court of Appeals in the West Virginia case (125 F.2d 255, at page 258) what Wiegand and Venuto did was to disclose an entirely new type of product having new characteristics and advantages and solving problems in connection with the use of the product which had long baffled those most highly skilled in the art. "Although a form of carbon black in which the dust nuisance would be eliminated had been sought diligently, it had not been found up to that time. The product of the patent not only solved this problem but also problems connected with handling and transportation. It did this by agglomerating the tiny particles of the powdered product into small granules or pellets which were dustless, which were flowable and which would disintegrate in the process of rubber manufacture so as to preserve the advantages of the dispersibility of the tiny particles."

In the West Virginia case, a large number—thirty-eight—prior patents were introduced in evidence in support of defendant's contention of anticipation. As the Court of Appeals said, this in itself tended to weaken the contention as to lack of novelty, because reference to many prior patents almost inevitably means that either none of them is very similar to the invention in question, or that prior attempts to solve the problem involved have not met with success. As a matter of fact, only five of the thirty-eight prior patents were seriously relied upon by defendant in the prior litigation of the original patent. All of these five and no others have been stressed in the present proceeding. These five patents are Geer No. 1,245,700 (1917); Lewis No. 1,263,082 (1918); Knowlton & Hoffman No. 1,286,024 (1918); Trent-British Patent No. 183,430 (1923); and Coffin & Keen No. 1,561,971 (1925).

We find, just as did the Circuit Court of Appeals in the West Virginia suit on the original patent, that none of these patents discloses such a product as is covered by the reissue patent.

Taking up these prior patents in the order just stated, the Geer patent involves the mixing of the carbon black particles with kerosene oil or water and then compounding it with rubber. The evidence discloses that this patent was a failure. The patentee was the chief technician of the Goodrich Company. The use of oil or water as a binder was objectionable to the rubber industry. Evaporation of the binder was incomplete or difficult of accomplishment.

The Lewis patent involves the caking of carbon black by mixing it with a liquid, and then drying the mixture. The resultant product is a cake which is to be broken up, but, when dried, the dust nuisance remains. Also, there are no granules or pellets such as are produced by the patent in suit.

The Knowlton & Hoffman patent represents an attempt to improve on Geer and Lewis. It calls for granulation of the carbon black by mixing it with a volatile liquid, and then drying it. But here again, the prohibited element, the binder, was involved. Respecting this patent, the Court of Appeals said, in denying a petition for rehearing which stressed that patent (126 F.2d 3, 4): "It is true that that patent speaks of using 'water or other volatile liquid alone'; but the patent does not disclose how this may be done in such way as to reduce the pellets of the patent in suit, and the mere reference to the Geer patent did not enable the industry to combine the two processes so as to produce them. The use of the Knowlton and Hoffman process without the starch binder results in an agglomerated product in the form of a mud cake which is broken up with the revival of the dust nuisance into particles, which because of their harshness, are not readily dispersible in the rubber. As pointed out in the original opinion, nothing was contributed to the art either by this patent or by the patent to Geer. Both were mere failures in the attempt to solve the problem which was solved by the product of the patent in suit."

As the Court of Appeals said in the West Virginia case (125 F.2d 255, at page 259), respecting the three patents above: "nothing was contributed to the art by any of these patents. They were granted to technologists of recognized eminence in the industry; and it is a safe assumption that, if they had contributed anything to the

solution of the problem which confronted the industry, their value would have been recognized and they would have been used. As it is, they show merely that the industry knew what was needed, but not how to achieve it."

The Trent-British patent involved a process for agglomerating coal dust with a binder of fuel oil to produce a fuel—briquettes. While it is true the patent is broad enough to cover the use of carbon black, nevertheless, the use of a binder as an essential ingredient removes the process from use in the rubber industry, and clearly differentiates it from the product in suit.

Lastly, little need be said respecting the Coffin & Keen patent because while, again, this patent is broad enough to cover the use of carbon black, it relates essentially to a process for drying clay. It makes no disclosure with respect to making globules or pellets out of carbon black, and, as Mr. Wiegand explained, the evaporation required of the extra amount of water called for by this patent (a gallon of water for every pound of carbon black) would preclude its successful application to the rubber industry. It is significant that the owner of this patent was the United States Rubber Company, which never exploited it with any success.

Thus, we conclude that although the Supreme Court said that, if the prior art patents "are read with the liberality and inclusiveness claimed for those in suit, they describe products, if not identical, at least of confusing similarity" (317 U.S. 228, 237, 63 S.Ct. 165, 170, 87 L.Ed. 232), this objection has been overcome by the claims as redrawn.

### Infringement.

Turning to the question of infringement, it is necessary to understand clearly defendant's processes, four in number, the products of which are alleged to infringe claims 1 and 2 of the reissue patent.

First, is the so-called United Carbon Wet Process—referred to in the West Virginia litigation as the Sayre Process, and the only process of defendant which was directly involved in that litigation. In this, carbon black is mixed with water and is mechanically formed into pellets by being agitated in drums containing a number of pins. The wet pellets are then removed from the drums and dried and screened. The unagglomerated carbon black is put back in the pin drums and reprocessed.

Second, is the so-called United Carbon Dry Process in which the carbon black, in a dry state, is fed into a revolving drum where it is agitated, and then fed into another revolving drum and the resultant material is screened; the fine rejected material is returned to the first drum, and the accepted material taken off in the form of small pellets.

Third, is the so-called Cabot Dry Process, which the patentee uses under license from the Cabot Company. In this process, agitation of the carbon black is accomplished by revolving a rotating cage at a high rate of speed through the mass of carbon black in a dry state whereby it is formed into pellets which are then screened, and those which are too small are returned and re-processed. This process is covered by claims in patents to Billings & Offutt No. 1,957,314 and its product by Billings reissue No. 19,750. These patents were the subject of extensive litigation in the Fifth Circuit between Godfrey L. Cabot, Inc., and the J. M. Huber Corporation. See Godfrey L. Cabot, Inc., v. J. M. Huber Corp., D.C., 35 F.Supp. 373 and Id., 5 Cir., 127 F.2d 805, in which the Cabot Dry Process patents were held valid but not infringed. The Huber Corporation had been a pioneer in this field and owned a junior process patent to Price, No. 2,164,164. One of the major contentions of the present defendant, in support of its position that its pellets do not infringe those of the patentee, is that patentee's reissue patent in suit does nothing more than disclose the great commercial utility of the old Huber pellets.

But pellets produced by neither one of defendant's dry processes are anticipated by the Huber product. The agitator bin of the Huber process did produce some round pellets, but they were neither uniform in size nor shape, and their production was considered an undesirable incident to the Huber dry process. In other words, their production was the very thing that gave rise to the problem which the patent now in suit solved. The ink trade took the Huber product to a considerable extent, and to that trade the pellets were a source of objection, so their formation was kept down to a minimum. The same procedure was followed with respect to the rubber

trade because the utility of the pellet as opposed to the powdered, completely broken product, was not yet recognized. There is no evidence that from the mass of the Huber product the pellets were screened off. Even if they had been, they would not have been comparable to the pellets produced later on by defendant's dry processes and by plaintiff's patent process, because they had no more density than that of the dusty mass itself in which they were created and upon which they really depended for support, in order to retain their consistency and spherical shape. Their density is shown to be only slightly more than 12 pounds to the cubic foot, whereas defendant's own witnesses have stated that pellets under a density of 20 pounds per cubic foot have no commercial utility in rubber manufacture.

That the pellets made by the dry processes here under consideration are distinctly different from those produced by the Huber process is further evidenced by the fact that both the Patent Office and the courts, in the Fifth Circuit, have recognized novelty and invention in the later dry processes.

Lastly, is the so-called United Carbon Extrusion Process by which carbon black is mixed with water forming a paste or dough, which is fed into a machine and is extruded by mechanical pressure through small holes or perforations, in stringlike form, like spaghetti, and is then dried, in the course of which the "strings" break up into granules or pellets of irregular and non-uniform shape.

In so far as the Extrusion Process is concerned, its non-infringement is quite evident because the pellets produced by this process, while they have comparable porosity and size range, differ from the product of the patent in suit in two vital respects: (1) They are not round, at least the round ones are a rarity; and (2) they are not smooth. This stands uncontradicted as disclosed by the microscopic photographs in evidence. Thus, while it is true that the use of a patented product in an impaired form may not avoid infringement, nevertheless that doctrine cannot be stretched to the point where it ceases to be reasonable. Otherwise, patentees would be given monopolies never contemplated. The Extrusion Process is covered by patent to Teegerstrom No. 2,213,059, issued August 22, 1940.

However, as respects the other three processes of defendant, that is, the Wet or Sayre Process which was involved in the prior West Virginia litigation, and the two Dry Processes, we are satisfied that the pellets produced by each of them are substantially the same as those of the patent in suit; and since there is no evidence that their manufacture antedated the patent in suit, they must be held to infringe. The defendant made no pellets until subsequent to the year 1933 by any of these processes, and its Wet or Sayre Process was not installed until 1939, whereas the plaintiff was producing pellets under the process of the patent as early as 1927. Nor is there anything in the evidence as presented to indicate that there is a material distinction between the product of defendant, if made from furnace carbon black, as contrasted with what is produced from carbon black made by the channel process. We have hereinbefore described both of these processes. In 1928, approximately 10,000 pounds of the pellets were sent out as samples to various rubber companies. In 1929, orders were received for some 20,000 pounds. In 1930, sales grew to 164,000 pounds, and five years later, that is, in 1935, they aggregated 15,000,000 pounds, with a steady increase year after year. Since 1931, however, the two-liquid process has been largely superseded by the so-called Glaxner one-liquid process, that is to say, water without the gasoline is used. This process is covered by Glaxner reissue patent No. 21,379, and the cost of manufacture has been considerably reduced thereby. Also, obnoxious gasoline fumes in the carbon black plants have been eliminated. It is conceded, however, that this improvement in the process has not changed the product itself and, therefore, is not a matter with which we are here directly concerned, except it should be pointed out that the so-called Wet Sayre Process of defendant's is the same as the Glaxner Process and that, as the Supreme Court pointed out in its opinion (317 U.S. 228, at page 231, 63 S.Ct. 165, at page 167, 87 L.Ed. 232), "the real impressive commercial success has been achieved since the development of the Glaxner process."

All of the pellets produced by defendant's processes, except by the Extrusion Process, have the same physical characteristics as plaintiff's pellets—not completely indistinguishable microscopically, but indistinguishable for all practical purposes.

This is clearly apparent from both the samples and photographs introduced in evidence, and from comparative microscope examination which the Court itself made in the course of the trial.

## Intervening Rights.

Finally, defendant asserts that, apart from everything else, plaintiff is precluded because of rights of the defendant which have intervened, from enforcing claims 1 and 2 against defendant or its customers with respect to carbon black pellets made by any of the processes employed by defendant, at any time prior to the date of the reissue patent, that is, March 7, 1944.

In other words, defendant invokes the principle that where a party has done what defendant claims it has done, namely, relied upon the invalidity of a patent, gone ahead and invested money and planned and carried out a program, it is inequitable to stop it from continuing to do that which it had a right to do. However, without going into an analysis of the extent to which the defendant may have developed its business in reliance upon the fact that claims 1 and 2 of patentee's original patent were found to be null and void, we are satisfied that the facts in the present case are such as not to warrant invoking the doctrine of intervening rights as announced by the decisions upon which defendant relies.

As we have seen, under the reissue statute, contrary to the disclaimer statute, there is no express provision as to what will constitute undue delay in applying for a reissue. The long established equity principle of laches applies, which of course, means that all of the facts and circumstances involved in each individual case must be weighed before determining whether or not the delay has been unreasonable. This means then, that the extended litigation in the present case must be fully considered. As has heretofore been pointed out, the application for the reissue patent was filed within thirty days of the Supreme Court's decision and, in fact, three days before that Court's mandate had issued. Further, there is no evidence whatsoever in the present case that the patentee, at any time, was lacking in due diligence in the prosecution of the reissue application in the Patent Office. Thus, such cases as Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658, Chapman v. Wintroath, 252 U.S. 126, 40 S.Ct. 234, 64 L.Ed. 491,

Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792, and Altoona Theatres v. Tri-Ergon Corp., supra, upon which defendant relies —and which have established the rule that if there has been a delay of more than two years from the date of the granting of the original patent in applying for a reissue, intervening rights, public or private, fatal to a reissue will be presumed, in the absence of any sufficient contrary evidence— are not controlling in the present case, in the sense that they must be blindly followed without due regard to whether or not there is sufficient evidence to rebut such presumption. Defendant took the patentee to the Supreme Court. That Court took away from the patentee the rights which the Court of Appeals had accorded it, but did so upon merely one ground, namely, the indefiniteness of the claims, and indicated the course, and the only course, which then lay open to the patentee by which it might seek to meet the objections on this ground which the Supreme Court had announced, namely, through application for a reissue. There can be no serious contention that after the reissue patent was granted to the patentee, it was tardy in charging the defendant with infringement, or in endeavoring, through the present consolidated proceedings, to have the rights of the parties determined with reasonable promptness.

In Topliff v. Topliff, supra, there is an exhaustive review of the Supreme Court's earlier decisions involving the question of laches with respect to applications for reissue patents, and in the course of summarizing its views, the Court stated (145 U.S. 156, at pages 170, 171, 12 S.Ct. 825, at page 831, 36 L.Ed. 658): "That due diligence must be exercised in discovering the mistake in the original patent, and that, if it be sought for the purpose of enlarging the claim, *the lapse of two years will ordinarily, though not always,* be treated as evidence of an abandonment of the new matter to the public to the same extent that a failure by the inventor to apply for a patent within two years from the public use or sale of his invention is regarded by the statute as conclusive evidence of an abandonment of the patent to the public." Further, "That this court will not review the decision of the commissioner upon the question of inadvertence, accident, or mistake, unless the matter is manifest from the record; but that *the question whether the*

*application was made within a reasonable time is, in most, if not in all, such cases, a question of law for the court."* (Italics inserted.)

To summarize and conclude: Claims 1 and 2 of the reissue patent in suit are valid and infringed by the products of the defendant made by all of defendant's processes except the product made by defendant's Extrusion Process.